UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

HELLENIC PETROLEUM, LLC,                    Case No. 21-15568-EPK

      Debtor.                                    Chapter 11
_____/

***EMERGENCY* MOTION (I) TO OBTAIN POST-PETITION FUNDING
AND GRANT FIRST PRIORITY LIEN POSITION, (II) COMPROMISE
CONTROVERSY WITH NEW YORK ENTITIES, AND
AND (III) TO USE CASH COLLATERAL**

**\*\* Emergency Hearing Requested Pursuant to Local Rule 9075-1 \*\***

**Prepetition, the debtor has been contesting a separate, involuntary chapter 7 bankruptcy case filed against it in this Court.  *See* Case No. 21-12317-EPK.**

**The filing of the involuntary case has cause immense damage to the debtor's business and cash flow.  Absent an immediate liquidity infusion there is a strong likelihood that the debtor's business will fail as a going concern, to the detriment of the estate and its creditors.**

**In light of this dynamic, and the irreparable harm that may result absent the relief requested herein, the debtor respectfully requests that this matter be scheduled for hearing on or before Wednesday June 9, 2021.**

Debtor in Possession, Hellenic Petroleum, LLC ("Hellenic" or the "Debtor"), pursuant to 11 U.S.C. §§ 105, 363 and 364, and Fed. R. Bankr. P. ("FRBP") 4001 and 9019, respectfully requests that the Court: (a) authorize it to obtain postpetition funding and grant a first priority lien position, (b) approve a proposed settlement with the New York Entities (as such term is defined *infra*), and (c) authorize cash collateral use, as set forth *infra*.  In support of these requests the Debtor states:

{2387/000/00523486}

## BACKGROUND

### A.    The Bankruptcy Filing.

1.    Hellenic is a Florida limited liability company formed in 2016.  The company is engaged in the fuel industry.  Its business practices include: (a) buying and selling fuel, whether diesel, renewable or biodiesel marine, (b) storing and transporting fuel, and (c) delivering fuel to truck stops and gas stations.  Hellenic owns a California facility of three acres at which trucks and fuel are stored.

2.    The principal of Hellenic is an individual named Panagiotis "Pete" Kechagias ("Mr. Kechagias").

3.    Hellenic generates revenues by selling fuel to customers.  Revenues received by Hellenic are used to pay operational expenses and to reduce payables.

4.    For several years after its founding Hellenic ran a successful business.  Recently, however, the company suffered two shocks that disrupted its business model.

5.    First, the Covid-19 pandemic disrupted the global economy and caused substantial fluctuations in fuel prices.  The pandemic caused oil demand to fall rapidly, which famously resulted in United States oil prices being negative for the first time on record.[1]  The first half of 2020 saw a collapse in oil prices exacerbated by a belated response from oil producing countries to reduce production.  Prices gradually recovered in the second half of the year.

6.    During this time period Hellenic was at the mercy of volatile markets.  Its cash flows were impacted as fluctuating energy prices could result in higher-than-expected supply costs, coupled with reduced sale prices.

---

[1]        *See, e.g.*, *U.S. Oil Prices Turn Negative as Demand Dries Up*, a BBC article that is publicly available at https://www.bbc.com/news/business-52350082.

7.      By early 2021 Hellenic believed it had weathered the proverbial storm and was on a path to recovery.  At this point in time, however, the second shock hit when a creditor, Pro Petroleum, LLC ("Pro Petroleum") filed an involuntary petition for relief under chapter 7 of the Bankruptcy Code against Hellenic in the United States Bankruptcy Court for the Southern District of Florida.  *See* Case No. 21-12317-EPK.  Hellenic is contesting the involuntary petition and that matter remains pending before the Court.

8.      The filing of the involuntary petition has cause immense damage to Hellenic, and kicked the company back into the hole it had just emerged from.  Due to the filing, no suppliers are prepared to do business with Hellenic on credit.  They require cash on delivery.  The suppliers and their credit lines are the lifeblood of Hellenic—without the ability to purchase fuel, Hellenic has no fuel to sell.  If the supplier dynamic is not rectified in the near future, it will prove fatal to the company.  The Hellenic Petroleum name, which is trademarked in the United States and Dubai, is now synonymous with bankruptcy.  A potential purchase of an Ohio refinery has evaporated, as the investors participating in the project have left.

9.      In light of the immense damage caused by Pro Petroleum, Hellenic filed for chapter 11 bankruptcy relief to preserve its assets, restructure its debts and maintain its value as a going concern.

**B.      The Proposed Liquidity Infusion.**

10.      Hellenic possesses an immediate need for liquidity to save its business.  Again, due to the involuntary bankruptcy initiated by Pro Petroleum suppliers are not prepared to do business with Hellenic on credit.  The company requires an immediate cash infusion to purchase fuel.

11.      The need for liquidity is especially urgent in the petroleum industry.  Specifically, suppliers apportion fuel for distribution in the early part of a month.  If orders are not placed with

{2387/000/00523486}

a supplier relatively early in a month, the supplier will sell its fuel to third parties and be unable to fulfill orders until the subsequent month.

12.     Similarly, fuel purchasers such as truck stops require a constant flow of fuel from a reliable source.  If a supplier such as Hellenic can only provide fuel on an intermittent basis, its customers will leave.

13.     Given these dynamics, Hellenic is burning the proverbial candle at both ends without liquidity—its suppliers are selling fuel to third parties early in the month and customers are leaving.

14.     Hellenic cannot continue to operate under these circumstances.  The company requires an immediate cash infusion to resume operations.  Hellenic believes that, with the $1 million cash infusionreferenced *infra*, it will be able gross some $100,000 per week in revenues, subject to business expenses other than fuel costs (which have been accounted for in this calculation).

15.     Following negotiations, Hellenic has reached proposed arrangements to obtain working capital with three entities.

16.     The first such contract is with Fairmont Capital Group ("Fairmont").  A copy of the proposed contract is attached as **EXHIBIT "A"** (the "Fairmont Contract").

17.     The material terms of the Fairmont Contract include the following:

- Fairmont shall purchase $600,000.00 of the Debtor's future receivables for $400,000.00, net of the fees listed in Appendix A to the Fairmont Contract.

- The Debtor shall deposit its future receivables into a debtor in possession account, and pay Fairmont $3,857.14 each business day from the account until the Fairmont receives all future receivables it purchased; provided, however, that the Daily Amount is subject to revision and shall rise to 100% of future receipts in the event of a default.  *See* Fairmont Contract ¶¶ 1–3.

Case 21-15568-EPK    Doc 8    Filed 06/07/21    Page 5 of 72


- The Debtor shall grant Fairmont a security interest in substantially all personal property now owned or hereafter acquired. *See id.* at ¶ 14.

- The Fairmont Contract is governed by the laws of the State of New York. *See id.* at ¶ 20.

- The Debtor and its principal, Mr. Kechagias, shall each separately guaranty performance under the Fairmont Contract.

- The Debtor possesses an early payment option of $540,000.00, so long as certain conditions are met. These conditions include that such amount is paid on or before December 17, 2021, and the Debtor has made transfers of the future receivables pursuant to a defined Payment Schedule without having missed more than two transfers.

18.    The second contract is with Fresh Funding ("Fresh Funding"). A copy of the proposed contract is attached as **EXHIBIT "B"** (the "Fresh Funding Contract").

19.    The material terms of the Fresh Funding Contract include the following:

- Fresh Funding shall purchase $300,000.00 of the Debtor's future receivables for $200,000.00.

- The Debtor shall deposit its future receivables into a debtor in possession account, and pay Fresh Funding $2,500.00 each business day from the account until the Fresh Funding is paid in full, to a maximum of 25% of generated receipts each business day.

- The Debtor shall grant Fresh Funding a security interest in substantially all personal property now owned or hereafter acquired. *See id.* at ¶ 26.

- The Fresh Funding Contract is governed by the laws of the State of New York. *See id.* at ¶ 11.

- The Debtor and its principal, Mr. Kechagias, shall each separately guaranty performance under the Fairmont Contract.

- The Debtor possesses an early payment option of $270,000.00, so long as certain conditions are met. These conditions include that such amount is paid on or before December 31, 2021, and the Debtor has made payments pursuant to a defined Payment Schedule.

20.    The final contract is with GFE NY, LLC ("GFE"). A copy of the proposed contract is attached as **EXHIBIT "C"** (the "GFE Contract").

{2387/000/00523486}

5

21.     The material terms of the GFE Contract include the following:

- GFE shall purchase $600,000.00 of the Debtor's future receivables for $400,000.00, net fees of approximately $20,000.00.

- The Debtor shall deposit its future receivables into a debtor in possession account, and pay GFE $3,857.14 each business day from the account until the GFE is paid in full, to a maximum of 15% of generated receipts each business day.

- The Debtor shall grant GFE a security interest in substantially all personal property now owned or hereafter acquired.

- The GFE Contract is governed by the laws of the State of New York.

- The Debtor and its principal, Mr. Kechagias, shall each separately guaranty performance under the GFE Contract.

- The Debtor possesses an early payment option of $540,000.00, so long as certain conditions are met.  These conditions include that such amount is paid on or before December 17, 2021, and the Debtor has made payments pursuant to a defined Payment Schedule.

22.     The terms of the Fairmont Contract, Fresh Funding Contract and GFE Contract (together, the "Contracts") are summarized herein for convenience and brevity purposes only. Interested parties are strongly encouraged to review the Contracts in their entirety.

**C.     Filed UCC's.**

23.     As stated *infra* the Debtor proposes to grant Fairmont, Fresh Funding and GFE (together, the "New York Entities") senior security interests that are *pari passu* with one another.

24.     A list of prepetition UCC filing statements filed against the Debtor is set forth below.  As set forth in the list: (a) certain creditors that have filed financing statements have been paid in full, (b) other creditors consent to the relief requested herein, (c) the Debtor is attempting to contact and obtain the consent of the remaining creditors.

{2387/000/00523486}

**UCC List**

| Creditor | Date of UCC | Collateral | Status |
|---|---|---|---|
| | | | |
| First Community Bank | Sep. 5, 2017 | Two freightliners | Paid in full. |
| Business Capital Providers, Inc. | Oct. 12, 2017 | All personal property | Debtor is attempting to contact and obtain consent. |
| Advantage Capital Funding | Nov. 14, 2018 | All personal property | Paid in full. |
| Corporation Services Company, as representative ("CSC") | July 17, 2019 | All personal property | Debtor is attempting to contact and obtain consent. |
| Divergent Capital, Inc. (Global Merchant Cash, Inc. also listed as additional secured party) | Jul. 26, 2019 | All personal property | Paid in full. |
| CSC | Aug. 15, 2019 | All personal property | Debtor is attempting to contact and obtain consent. |
| GFE NY, LLC | Oct. 29, 2019 | All personal property | Consents. |
| CSC | Jan. 3, 2020 | All personal property | Debtor is attempting to contact and obtain consent. |
| Divergent Capital, Inc. | Mar. 16, 2020 | All personal property | Paid in full and consents. |
| U.S. Small Business Administration | Sep. 7, 2020 | All personal property | Debtor is attempting to contact and obtain consent. |
| CSC | Oct. 27, 2020 | Two vehicles. | Debtor is attempting to contact and obtain consent. |
| Fresh Funding Solutions, LLC | Nov. 12, 2020 | All accounts receivable and other receipts | Consents. |
| CSC | Mar. 5, 2021 | All personal property | Debtor is attempting to contact and obtain consent. |
| Cedar Advance, LLC | Mar. 8, 2021 | All personal property | Debtor is attempting to contact and obtain consent. |
| Fresh Funding Solutions, LLC | Mar. 10, 2021 | All personal property | Consents. |

**D.      Proposed Settlement With New York Entities.**

25.      In addition to proposing postpetition funding to the Debtor, GFE, Fresh Funding and Fairmont Capital provided funding to the Debtor prepetition, have pre-petition security interests and have and filed UCC Financing Statemetns.  *See* § C *supra*.  A dispute has arisen between the Debtor on one hand, and GFE, Fairmont Capital and Fresh Funding on the other hand, as to whether the transactions between the parties are sales of future receipts, or are disguised financing transactions which may subject the New York Entities to various claims.  In an effort to resolve this dispute, and to encourage the New York Entities to extend the funding referenced *supra*, the parties have reached the following proposed agreement: (a) the Debtor shall waive any prepetition claims that it may hold against the New York Entities, (b) the New York Entities shall enter into the Contracts, (c) the New York Entities shall waive any claim that cash held by the Debtor as of the petition date constitutes their property that is not property of the estate pursuant to a purchase agreement and the Debtor shall immediately start making payments to the New York Entities post-petition that will be applied to the pre-petition claims, (d) the New York Entities shall support the Debtor's use of cash collateral as set forth hereinbelow, and (e) New York Entities shall have allowed secured claims in this bankruptcy and shall reduce the amounts of their prepetition secured claims as follows:

| Creditor | Alleged Amount of Claim | Reduced Amount of Claim if Agreement is Approved |
|---|---|---|
| Fairmont | $1,921,522.86 | $1,896,522.86 |
| Fresh Funding | $701,893 | $592,518 |
| GFE | $1,805,150.40 | $1,559.696 |

The foregoing agreement shall be referred to as the "Agreement".

## RELIEF REQUESTED AND BASIS FOR RELIEF

**A.     DIP Funding.**

26.     Through the Motion, the Debtor first requests that the Court enter an order authorizing the Debtor to obtain post-petition funding from the New York Entities in accordance with the terms and conditions set forth in the Motion and Contracts, and granting the New York Entities *pari passu* first-priority liens on all the Debtor's assets, pursuant to 11 U.S.C. §§ 105 and 364(c), (d) and (e) and FRBP 4001(c); provided, however, that such liens shall be subject to a carveout in for the fees and costs of bankruptcy counsel for the Debtor, as well as fees and costs of the Office of United States Trustee (the "Carveout").[2]

27.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or super-priority financing under certain circumstances.  Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its reasonable business judgment in obtaining such credit.  *See In re YL W. 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest").

---

[2]     Proposed bankruptcy counsel for the Debtor, Shraiberg, Landau & Page, P.A., is filing an application to employ contemporaneously herewith.
{2387/000/00523486}

28.     Section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt: "(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  11 U.S.C. § 364(c).

29.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

30.     Section 364(d)(1) of the Bankruptcy Code permits the Court to authorize post-petition financing under which a debtor grants the post-petition financierr a senior lien on property of the estate if the debtor is unable to obtain credit or other unsecured financing under sections 364(a), (b), or (c) of the Bankruptcy Code.  11 U.S.C. § 364.  *See, e.g.*, *In re Western Pacific Airlines, Inc.,* 223 B.R. 567 (Bankr. D.Col. 1997); *In re Levitt & Son, LLC*, 384 B.R. 630 (Bankr. S.D. Fla. 2008); *In re Devlin d/b/a Desert Inn Resort Motel,* 185 B.R. 376 (Bankr. M.D.Fla. 1995);

*In re Ames Dept. Stores, Inc.,* 115 B.R. 34 (Bankr. S.D.N.Y. 1990); *In re Au Natural Restaurant, Inc.,* 63 B.R. 575 (Bankr. S.D.N.Y. 1986).

31.     The New York Entities have offered to provide funding to the Debtor in thegross principal amount of $1 million, secured by a first-priority lien on all of the Debtor's existing and future acquired property pursuant to section 364(d)(1), and secured by a first-priority lien on all of the Debtor's existing and future acquired unencumbered property pursuant to section 364(c)(2), as set forth in the Contracts.  The liens to be granted in favor of the New York Entities shall prime any lien held by other secured creditors and is subject to the Carveout. The New York Entities shall also be granted allowed secured claims in the amounts identified above that shall be paid in full.

32.     The Debtor has been unable to obtain unsecured credit allowable solely as an administrative expense pursuant to sections 364(b) and 503(b) of the Bankruptcy Code, and also has been unable to obtain credit solely having priority over all other administrative expenses specified in sections 503(b) and 507(a) and (b) of the Bankruptcy Code.

33.     As discussed above, given the Debtor's current financial condition, lack of cash flow, and minimal unencumbered assets, the Debtor is unable to obtain funding on terms more favorable than those provided by the New York Entities.

34.     After appropriate investigation and analysis, the Debtor concluded that the proposed funding set forth herein and in the Contracts is the only alternative available under the circumstances of this case.  Without the liquidity provided by the proposed funding, the Debtor would be unable to pay for its day-to-day operations and be able to preserve its going concern value.  The foregoing is essential to preserving the company's value for the benefit of its creditors and interest holders. Approval of the proposed funding and the relief requested herein will permit

{2387/000/00523486}

the Debtor to stabilize its business, achieve an improved financial performance, and consummate a sale transaction.  The foregoing will preserve and maximize the value of the Debtor's business.

35.     Moreover, the Debtor could not locate different post-petition funding offering terms more favorable than the New York Entities, and certainly not before all the Debtor's limited cash resources were depleted by such search.  Thus, the Debtor exercised its best business judgment in negotiating the proposed funding that is presently before the Court.  The Debtor submits that the post-petition funding requested herein is in the best interests of the Debtor, its creditors, and its estate.

36.     The Debtor submits that the terms and conditions of the proposed funding are fair and reasonable, and are in the best interests of the Debtor, its estate and its creditors.

37.     The New York Entities are extending funding to the Debtor in good faith and, therefore, should be accorded the protections of Section 364(e) of the Bankruptcy Code.

38.     Additionally, the Court should modify the automatic stay imposed by section 362(a) of the Bankruptcy Code to allow the New York Entities and/or the Debtor, as appropriate, to execute and file or record all documents, and take all other acts, reasonably required to provide the lien and security interests contemplated by the Contracts relating to the proposed funding, if approved by the Court.

39.     Finally, § 364(d) requires that secured creditors whose liens are being primed by postpetition funding must be adequately protected.  The Debtor respectfully submits that such creditors are adequately protected or consent in this instance.  As stated *supra* the creditors that have filed UCC's either: (a) have no balances owing to them, (b) consent to the relief requested herein or (c) will be contacted by the Debtor in an effort to obtain their consent.

B.     The Agreement.

In addition to approving the funding referenced above, the Debtor respectfully requests that the Court approve the Agreement.

The Court may approve a compromise or settlement after notice and a hearing.  Fed. R. Bankr. P. 9019.

"It is generally recognized that the law favors compromise of disputes over litigation for litigation sake," and settlements should be approved unless they "fall below the lowest point in the range of reasonableness."  *In re Bicoastal Corp.*, 164 B.R. 1009, 1016 (Bankr. M.D. Fla. 1993).

When considering settlements for approval, the bankruptcy court is to "determine whether the proposed settlement is fair and equitable."  *GMGRSST, Ltd. v. Menotte (In re Air Safety Int'l, L.C.)*, 336 B.R. 843, 852 (S.D. Fla. 2005).  The Eleventh Circuit Court of Appeals has set forth factors to assist bankruptcy courts in determining whether a settlement proposal meets the appropriate standard.  *Id.*  These factors are as follows: (1) the probability of success in the litigation; (2) the difficulties, if any, to be encountered in the matter of collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises (the "Justice Oaks Factors").  *See Wallis v. Justice Oaks II, Ltd.*, 898 F.2d 1544, 1549 (11th Cir. 1990).

The *Justice Oaks* Factors weigh in favor of approving the terms of the Agreement.  In particular:

- The outcome of litigation against the New York Entities is uncertain.  The Debtor believes that the prepetition contracts with the New York Entities constitute disguised financing arrangements that may give rise to claims.  For example, despite characterizations of the transactions as 'purchases' of future receivables, the contracts are replete with terms that make the transactions looks like loans. Conversely, the New York Entities allege that

the contracts define the transaction as a purchase, and that said transactions are permissible under New York law. The first *Justice Oaks* factor supports the Agreement.

- Upon information and belief the New York Entities are each an established institution that would be able to satisfy an adverse judgment. Overall, the second *Justice Oaks* factor is neutral or disfavors the settlement.

- The litigation against the New York Entities would not be overly complex; however, the resources of the Debtor are extremely limited. The Debtor has again suffered the twin shocks of marketplace disruptions due to Covid-19 and an involuntary bankruptcy filing. It is seeking funding from the New York Entities in an effort to preserve its business as a going concern. The Debtor lacks the resources to effectively litigate against the same entities it seeks funding from.

  The third *Justice Oaks* factor, that of expense of litigation, weighs heavily in favor of the settlement.

- Finally, the Agreement benefits the Debtor's creditors by providing the estate with liquidity, permitting the Debtor to resume operations, and preserving the business of the Debtor as a going concern. The Agreement is also being noticed to creditors. The final *Justice Oaks* factor also favors the settlement.

In light of the foregoing, the Agreement satisfies the *Justice Oaks* factors, and is thus fair and equitable. The Court should approve the Agreement.

## C.    Cash Collateral.

40.    Finally, the Debtor requests that the Court approve the use of cash collateral existing on the petition date, if any.

41.    By way of background, the Debtor believes that its postpetition cash use will consist of the funding that is the subject of this motion. In an abundance of caution, however, in the event prepetition cash collateral exists, the Debtor respectfully seeks its use pursuant to the budget attached as **EXHIBIT "D"** (the "Budget").

42.    The Debtor's use of property of its estate is governed by § 363 of the Bankruptcy Code, which provides in pertinent part that:

{2387/000/00523486}

14

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the [debtor] may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with § 363.  *See* 11 U.S.C. § 1107(a).

When a chapter 11 debtor in possession is authorized to operate its business, it may use property of estate in the ordinary course of business, but is prohibited from using cash collateral absent consent of the secured creditor or court authorization.  11 U.S.C. § 363(c).  The Code defines "cash collateral" as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest . . ."  11 U.S.C. § 363(a).

The Debtor again believes that it will operate its business postpetition using the funds obtained from the New York Entities.  In an abundance of caution, however, and to account for any cash collateral that may exist as of the petition date, the Debtor submits that cash collateral use is appropriate because secured creditors are adequately protected.

The Bankruptcy Code does not define "adequate protection" but does provide a non-exclusive list of the means by which a debtor may provide adequate protection, including "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in its collateral.  *See* 11 U.S.C. § 361; *see In re Potvin Lumber Company, Inc.*, 24 B.R. 54 (Bankr. D. Vt. 1982) (ordering that the debtor could use cash collateral, and finding that the bank was adequately protected because the total value of the debtor's personal property exceeded the bank's

indebtedness).

Adequate protection is to be determined on a case-by-case factual analysis.  *See Mbank Dallas, N.A. v. O'Connor (In re O'Connor*), 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *see also* S. Rep. No. 95-989, 95th Cong., 2d Sess. 54 (1978). For example, *O'Connor* states that "[i]n order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard."  808 F.2d at 1396. (citations omitted).

Adequate protection is meant to ensure that a secured creditor receives the value for which it originally bargained pre-bankruptcy.  *Swedeland Dev. Group., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (citation omitted).  The essence of adequate protection is to ensure the maintenance and continued responsibility of lien values during the interim between filing and confirmation in a case.  *In re Arriens*, 25 B.R. 79, 81 (Bankr. D. Or. 1982).

The Debtor submits that creditors are adequately protected in this instance.  Pursuant to the Budget, the Debtor will be operating on cash flow positive basis.  The continued operation of the Debtor's business will preserve its going concern value, enable it to capitalize on that value through a reorganization strategy, and ultimately facilitate its ability to confirm a chapter 11 plan.

It is well established that a bankruptcy court, where possible, should resolve issues in favor of preserving the business of the debtor as a going concern:

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use "cash collateral" in its efforts to rebuild.  Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

*In re George Ruggiere Chrysler-Plymouth, Inc.*, 727 F.2d 1017, 1019 (11th Cir. 1984); *see In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (debtor permitted to use cash collateral when

{2387/000/00523486}

creditor was undersecured because such use was necessary to its continued operations and the creditor's secured position can only be enhanced by the continued operation of the debtor's business).

Creditors are adequately protected, and the Court should accordingly authorize the Debtors' cash collateral use under § 363(c).

As a final note, the New York Entities may allege that cash held by the Debtor belongs to the New York Entities by virtue of prepetition receivables purchases, and that the estate holds no more than a possessory interest therein. The Debtor notes that the Agreement, which the Debtor seeks approval of herein, provides for the New York Entities to waive such claim and consent to cash collateral use pursuant to the Budget.

**D.    Interim Relief.**

43.    Fed. R. Bankr. P. 4001(b)(2) permits the Court to conduct a preliminary hearing on cash collateral use, and authorize the use of cash necessary to avoid immediate and irreparable harm, but prohibits a final hearing no earlier than 14 days after service of the motion. Fed. R. Bankr. P. 4001(b)(2). Similarly, Fed. R. Bankr. P. 4001(c)(2) permits the Court to authorize the immediate obtaining of credit to the extent necessary to avoid immediate and irreparable harm, but prohibits a final hearing earlier than 14 days after service of the motion. Fed. R. Bankr. P. 4001(c)(2).

44.    The Debtor faces immediate and irreparable harm in light of the dynamics outlined *supra*. The Debtor requires immediate liquidity to purchase fuel from suppliers before advancing too far into the month of June to do so. The Debtor additionally requires liquidity in order to sell fuel to customers and maintain its client base.

45.    Given this, the Debtor respectfully requests that the Court: (a) approve the funding

and cash collateral use requested herein on an interim basis, and (b) schedule a final hearing on the financing and cash collateral use, together with approval of the Agreement, on a timeframe that complies with Fed. R. Bankr. P. 4001.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an Order: (a) authorizing the Debtor to obtain post-petition funding from the New York Entities pursuant to the terms of the Contracts; (b) authorizing the funds provided under the proposed funding to be secured by a first-priority lien on all of the Debtor's existing and future acquired property, and secured by a first-priority lien on all of the Debtor's existing and future acquired unencumbered property, as set forth in the Contracts; provided, however, that such liens are subject to the Carveout; (c) approving the agreement; (d) authorizing the Debtor's cash collateral use pursuant to the budget attached as Exhibit "D"; (e) scheduling a final hearing on the Motion; and (f) granting the Debtor such further relief as the Court deems appropriate and just.

Respectfully Submitted,

**SHRAIBERG, LANDAU & PAGE, P.A.**
Proposed Attorneys for the Debtor
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
Email: bss@slp.law; pdorsey@slp.law

By:    /s/ *Bradley S. Shraiberg*
        Bradley S. Shraiberg
        Florida Bar No. 121622
        Patrick Dorsey
        Florida Bar No. 85841

{2387/000/00523486}

## **ATTORNEY CERTIFICATION**

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was furnished via Notice of Electronic Filing by CM/ECF to all parties registered to receive such service in this case on this the 7th day of June, 2021.

    /s/ *Bradley S. Shraiberg*
        Bradley S. Shraiberg

{2387/000/00523486}

19

# EXHIBIT A

{2387/000/00523486}

# FAIRMONT CAPITAL GROUP

### AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIPTS

| | |
|---|---|
| Seller's Legal Name: | HELLENIC PETROLEUM, LLC |
| D/B/A: | HELLENIC PETROLEUM |
| Form of Business Entity: | LLC |

| | | | |
|---|---|---|---|
| Street Address: | 7000 WEST PALMETTO PARK ROAD #302 | City, State, Zip: | BOCA RATON, FL 33433 |
| Mailing Address: | 7000 WEST PALMETTO PARK ROAD #302 | City, State, Zip: | BOCA RATON, FL 33433 |
| Primary Contact Name: | PANAGIOTIS KECHAGIAS | Title: | SOLE MEMBER |

| | |
|---|---|
| Federal Tax ID Number: | 81-4208066 |

| | |
|---|---|
| Purchase Price: | $400,000.00 |
| Purchased Amount: | $600,000.00 |
| Daily Amount: | $3,857.15 |
| Origination Fee: | (or up to 10% to be deducted from the purchase price) |
| Specified Percentage: | 15% |

| | |
|---|---|
| Account for the Deposit of All Future Receipts:  Bank: | TRI COUNTRIES BANK |
| Account No: | ████0164 |

JUNE 1, 2021

Effective, _____, Seller, identified above, hereby sells, assigns and transfers to Fairmont Capital Group, located at 333 Pearsall Avenue, STE 207, Cedarhurst, NY 11516 ("Buyer"), without recourse, the Specified Percentage of the proceeds of each future salemade by Seller (collectively "Future Receipts") until Seller has received the Purchased Amount.

"Future Receipts" includes all payments made by cash, check, or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card") or other form of monetary payment in the ordinary course of Seller's business.

As payment for the Purchased Amount, Buyer will deliver to Seller the Purchase Price, shown above, minus any Origination Fee shown above.

Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer.

Both parties agree that the obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee.

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes.

HELLENIC PETROLEUM, LLC

Seller:_____

Agreed to by:_____     **Print Name & Title:**PANAGIOTIS KECHAGIAS, SOLE MEMBER
                       (Signature)                                                _____

Agreed to by:_____     **Print Name & Title:**_____
                       (Signature)

FAIRMONT CAPITAL GROUP, LLC

Buyer:_____

Agreed to by:_____     _____
                       (Signature)                                           (Title)

1. **Delivery of Purchased Amount:** Seller must deposit all Future Receipts into the single business banking account specified above, which may not be used for any personal, family or household purposes (the "Account") and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor"), to deposit all Payment Card receipts of Seller into them Account. Seller agrees not to change the Account or add an additional Account without the express written consent of Buyer. Seller understands that it is responsible for ensuring that the Daily Amount is available. Seller shall remit the Daily Amount of Future Receipts to Purchaser each weekday until the Purchased Amount has been remitted to the Purchaser.

2. **Seller May Request Changes to the Daily Amount:** The initial Daily Amount is intended to represent the Specified Percentage of Seller's daily Future Receipts. For as long as no Event of Default has occurred, once each calendar month, Seller may request that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. No more often than once a month, Buyer may adjust the Daily Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five business days prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.

3. **Daily Amount Upon Default:** Upon the occurrence of an Event of Default, the Daily Amount shall equal 100% of all Future Receipts.

4. **Sale of Future Receipts (THIS IS NOT A LOAN):** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. If Future Receipts are remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach of or default under this Agreement. Buyer is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein. Seller agrees that it will treat Purchase Price and Purchased Amount in a manner consistent with a sale in its accounting records and tax returns. Seller agrees that Buyer is entitled to audit Seller's accounting records upon reasonable Notice in order to verify compliance. Seller waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Seller asserts that this transaction is anything other than a sale of future receipts.

5. **Fees and Charges**: Other than the Origination Fee, if any, set forth above, Buyer is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Seller. If Seller is charged another such fee, it is not being charged by Buyer. A list of all fees and charges applicable under this Agreement is contained in Appendix A.

6. **Credit Report and Other Authorizations:** Seller and each of the Owners signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Owners continue to have any obligation owed to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

7. **Authorization to Contact Current and Prior Banks:** Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

8. **Financial Information:** Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, bank or financial statements, tax returns, etc., as Buyer deems necessary in its sole discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update

such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

9.    **Transactional History:** Seller authorizes all of its banks and brokers and Payment Card processors to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon an Event of Default.

10.    **Publicity:** Seller hereby authorizes Buyer to use its name in listings of clients and in advertising and marketing materials.

11.    **Application of Amounts Received by Buyer:** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

12.    **Representations, Warranties and Covenants of Seller:**
 - **12.1. Good Faith, Best Efforts and Due Diligence:** Seller will conduct its business in good faith and will use its best efforts to continue its business at least at its current level, to ensure that Buyer obtains the Purchased Amount.
 - **12.2. Financial Condition and Financial Information:** Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly represent the financial condition of Seller at such dates, and Seller will notify Buyer immediately if there are material adverse changes, financial or otherwise, in the condition or operation of Seller or any change in the ownership of Seller. Buyer may request statements at any time during the performance of this Agreement and the Seller shall provide them to Buyer within five business days. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations. Seller further agrees to authorize the release of any past or future tax returns to Seller.
 - **12.3. Governmental Approvals:** Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.
 - **12.4. Authority to Enter into This Agreement:** Seller is a chapter 11 debtor in possession in a case pending in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"). The parties acknowledge and agree that entry into this Agreement is subject to the approval of the Bankruptcy Court following notice and a hearing.
 -
 - **12.5. Change of Name or Location or Sale or Closing of Business:** Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without **(i)** the express prior written consent of Buyer, and **(ii)** the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller agrees that until Buyer has received all of the Purchased Amount Seller will not voluntarilyclose its business on a temporarily basis for renovations, repairs, or any other purposes. This provision, however, does notprohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer ten business days notice to the extent practicable.
 - **12.6. Seller to Maintain Insurance:** Seller will possess and maintain insurance in such amounts and against such risks as are necessary to protect its business and will provide proof of such insurance to Buyer upon demand.
 - **12.7. Seller to Pay Taxes Promptly:** Seller will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes.
 - **12.8. No Diversion of Receipts:** Seller will not permit any event to occur that could cause a diversion of any of Seller's Future Receipts from the Account to any other entity.
 - **12.9. Seller's Knowledge and Representation:** Seller represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

13.    **Rights of Buyer:**
 - **13.1. Financing Statements Financing Statements and Security Interest:** Seller grants Buyer a security interest in all of Seller's present and future accounts, chattel paper, deposit accounts, personal property, assets and fixtures, general intangibles, instruments, equipment, inventory wherever located, and proceeds now or hereafter owned or acquired by Seller. Seller authorizes Buyer to file one or more UCC-1 forms consistent with the Uniform Commercial Code ("UCC") in order to give notice of this security interest and that the Purchased Amount of Future Receipts is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

**- 13.2. Right of Access:** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to:

(i) enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, and

(ii) Seller shall provide access to its employees and records and all other items as requested by Buyer, and

(iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

**- 13.3. Phone Recordings and Contact:** Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that

(i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions;

(ii) that such communications and contacts are not unsolicited or inconvenient; and

(iii) that any such contact may be made at any phone number, emails address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

**14.   Events of Default:** The occurrence of any of the following events shall constitute an "Event of Default":

(a) any act or omission by or on behalf of Seller that has the result of interfering with, or circumventing, the payment to Purchaser of the Purchased Amount, including without limitation, adding or changing processors without Buyer's prior written consent, conducting business under an alternative name, making use of any depository accounts other than the Account without Buyer's prior written consent, encouraging customers to avoid making card payments or other act that results in a material decrease in the monthly number of deposits made and/or processing batches deposited to the Account that is disproportionate to any changes in the Future Receivables, or manipulating the use and form of business entities for the purpose of avoiding Seller's obligations hereunder;

(b) Seller violates any representation, warranty, agreement, promise or covenant set forth in this Agreement;

(c) Seller applies for, or enters into, any other form of financing without the prior written consent of Buyer; provided, however, that Buyer acknowledge and agrees that Seller may seek funding arrangements with third parties contemporaneously herewith;

(d) Seller interferes with Buyer's access to electronic bank information for the Account;

(e) Seller defaults under any of the terms, covenants and conditions of any other agreement with Buyer; or

(f) Seller fails to remit the Daily Amount in the amount and manner specified in the Agreement;

(g) Seller completes a transaction that results in a change of control of Seller's business;

(h) Seller becomes subject to any judgment, garnishment, or tax lien following the date of this Agreement;

(i) Seller has an event of default under any other material agreement or contract; or

**15.   Remedies: If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:**

**- 15.1.** The Specified Percentage shall equal 100%. The full uncollected Purchased Amount plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately.

**- 15.2.** Buyer may enforce the provisions of the Personal Guaranty of Performance against each Owner.

**- 15.3.** Buyer may proceed to protect and enforce its rights and remedies in the Bankruptcy Court. In any such litigation, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**- 15.6.** Seller shall pay to Buyer all reasonable costs associated with the Event of Default and the enforcement of Buyer's remedies, including but not limited to court costs and attorneys' fees.

**- 15.7.** Buyer may exercise and enforce its rights as a secured party under the UCC.

**- 15.8.** All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**16.** **Modifications Agreements:** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Buyer.

**17.** **Assignment:** Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

**18.** **Notices:**

**- 18.1. Notices from Buyer to Seller:** Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective upon mailing to Seller's address set forth in this Agreement.

**- 18.2. Notices from Seller to Buyer:** Seller may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

**19.** **Binding Effect; Governing Law, Venue and Jurisdiction:** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, be instituted in the Bankruptcy Court. Seller agrees that the Bankruptcy Court is convenient to it,and submits to the jurisdiction of the Bankruptcy Court and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Buyer to transfer such proceeding to the Bankruptcy Court.

**20.** **Survival of Representation, etc:** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

**21.** **Interpretation:** All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**22.** **Entire Agreement and Severability:** This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**23.** **Facsimile Acceptance:** Facsimile signatures hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes.

**24.** (Stricken)

**25.** **Monitoring, Recording, and Solicitations:**

**- 25.1. Authorization to Contact Seller by Phone:** Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

**- 25.2. Authorization to Contact Seller by Other Means:** Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

**26.  JURY WAIVER:** THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**27.  CLASS ACTION WAIVER:** THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT:

(I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND

(II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**28.**  (Stricken)

**29.** (Stricken)

**30.** (Stricken)

HELLENIC PETROLEUM, LLC

**Seller:** _____

**Agreed to by:** PANAGIOTIS KECHAGIAS, SOLE MEMBER
_____ **(Signature), its** _____ **(Title)**

**Guarantor:** PANAGIOTIS KECHAGIAS
_____ **(Print Name) Signature:** _____

**Guarantor:** _____ **(Print Name) Signature:** _____

## <u>Appendix A – List of Fees and Charges</u>

In addition to the Purchased Amount of Future Receipts, the Agreement provides that the following fees shall be applied:

**1. Underwriting Fee** - $ _18,000.00_ Or up to 10% of Funding Amount

**2. Non-Sufficient Funds (NSF) Fee** - $ 35.00 each (Up to TWO TIMES ONLY before a default is declared)

**3. Stopped Fee** - $ 135.00

**4. ACH Processing Fee** - $ _2,000.00_

**5. UCC Filing Fee** - $ _200.00_

**6. Default Fee** - $5,000.00

## PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of <u>JUNE 1, 2021</u>, by

<u>HELLENIC PETROLEUM, LLC</u> (the "Guarantor"), for the benefit of Fairmont Capital Group ("Buyer"). Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Purchase Agreement (as hereinafter defined).

## RECITALS

**A.** Pursuant to that Agreement for the Purchase and Sale of Future Receipts (the "Purchase Agreement"), dated of even date herewith, between Buyer and <u>HELLENIC PETROLEUM, LLC D/B/A HELLENIC PETROLEUM</u> ("Seller"), Buyer has purchased Future Receipts of Seller.

**B.** Buyer is not willing to enter into the Purchase Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees prompt and complete performance to Buyer of all of the obligations of Seller; and
**C.** Guarantor will directly benefit from Buyer and Seller entering into the Purchase Agreement.

## AGREEMENT

As an inducement to Buyer to purchase the Future Receipts identified in the Purchase Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:
**1. Defined Terms:** All capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Purchase Agreement.

**2. Guaranty of Obligations:** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of Seller's obligations under the Purchase Agreement.

**3. Guarantor's Other Agreements:** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller without the prior written consent of Buyer, which may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor hereby agrees to pay all costs and attorney's fees incurred by Buyer in connection with any actions commenced by Buyer to enforce its rights or incurred in any action to defend its performance under the Purchase Agreement and this Guaranty. This Guaranty is binding upon Guarantor, and Guarantor's heirs, legal representatives, successors and assigns. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Purchase Agreement or otherwise modify, amend or change the terms of the Purchase Agreement. Guarantor is hereby notified that a negative credit report reflecting on his/her credit record may be submitted to a credit reporting agency if the terms of this Guaranty are not honored by the Guarantor.

**4. Waiver; Remedies:** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Purchase Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.

**5. Acknowledgment of Purchase:** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount is a purchase of the Purchased Amount and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of

usury in any action arising out of this Guaranty. Guarantor acknowledges the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount of Future Receipts.

**6. Governing Law and Jurisdiction:** This Guaranty shall be governed by, and constructed in accordance with, the internal laws of the State of New York without regard to principles of conflicts of law. Except as provided in Section 9 of this Guaranty, Guarantor submits to the exclusive jurisdiction and venue of the state or federal courts having jurisdiction over any city/county in the State of New York of any claims or actions arising, directly or indirectly, out of or related to this Guaranty. The parties stipulate that the venues referenced in this Agreement are convenient. The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

**7. JURY WAIVER:** THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**8. CLASS ACTION WAIVER:** THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT:
(I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND
(II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**9. ARBITRATION:** IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). BUYER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR NAF RULES. SELLER AND THE GUARANTOR AGREE THAT, BY ENTERING INTO HIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY, BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OR A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID.

**10. RIGHT TO OPT OUT OF ARBITRATION:** SELLER AND GUARANTOR(S) MAY OPT OUT OF THIS CLAUSE. TO OPT OUT OF THIS ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THIS CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: BUYER – ARBITRATION OPT OUT, FAIRMONT CAPITAL GROUP, 333 PEARSALL AVE, CEDARHURST, NY 11516, BROOKLYN, NEW YORK 11204, ATTENTION: LEGAL DEPARTMENT.

**11. Service of Process:** In addition to the methods of service allowed by the New York state civil practice law & rules ("CPLR"), seller hereby consents to service of process upon it by registered or certified mail, return receipt requested, service hereunder shall be complete upon seller's actual receipt of process or upon buyer's receipt of the return thereof by the united states postal service as refused or undeliverable. Seller must promptly notify buyer, in writing, of each and every change of address to which service of process can be made. Service by buyer to the last known address shall be sufficient, seller will have (30) calendar days after service hereunder is complete in which to respond. Furthermore, seller expressly consents that any and all notice(s), demand(s), request(s) or other communication(s) under and pursuant to this agreement for the purchase and sale of future receivables shall be delivered in accordance with the provisions of this agreement for the purchase and sale of future receivables.

**12. Severability:** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.

**13. Opportunity for Attorney Review:** The Guarantor represents that it has carefully read this Guaranty and has, or had a reasonable opportunity to, consult with its attorney. Guarantor understands the contents of this Guaranty and signs this Guaranty as its free act and deed.

**14. Counterparts and Facsimile Signatures:** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

**For Individual Guarantors -**
**Guarantor:** PANAGIOTIS KECHAGIAS _____ **(Print Name)**
**Signature:** _____

**For Individual Guarantors -**
**Guarantor:** _____ **(Print Name)**
**Signature:** _____

**For Corporate Guarantors (or other entities) -**
**Guarantor:** HELLENIC PETROLEUM, LLC _____
**By:** PANAGIOTIS KECHAGIAS _____
**Print Name of Signer:** _____
**Its:** SOLE MEMBER _____ **(Official Position)**

**Dear Seller,**

**Please fill out the form below with the access information for your bank account, please write legibly and indicate lower/upper case sensitivity.**

**Legal Name/ DBA:** _____

**Bank portal website:** _____

**Username:** _____

**Password:** _____

**Security Question/Answer 1:** _____

**Security Question/Answer 2:** _____

**Security Question/Answer 3:** _____

**Security Question/Answer 4:** _____

**Security Question/Answer 5:** _____

**Security Question/Answer 6:** _____

**Any other information necessary to access your account:** _____

# FAIRMONT CAPITAL GROUP

## EXHIBIT A

### ADDITIONAL ENTITIES SUBJECT TO THE TERMS OF THIS CONTRACT

I.   HELLENIC PETROLEUM, LLC.

PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD , SUITE 302, BOCA RATON, FLORIDA, 33433

TAX ID: 81-4208066


2. HELLENIC SEAS HOLDINGS INC

PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433

TAX ID: 81-4208066


3. CONSOLIDATED RESOURCES, INC

PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433

TAX ID: 81-4208066


4. MYKONOS GREEK BISTRO, LLC.

PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433

TAX ID: 81-4208066


5. HELLENIC MANAGEMENT LLC

PHYSICAL ADDRESS: 9858 GLADES ROAD; SUITE 219, BOCA RATON, FLORIDA, 33433

TAX ID: 81-4208066


6. CAPITAL TRADE FINANCE LLC

PHYSICAL ADDRESS: 9858 GLADES ROAD;SUITE 219, BOCA RATON, FLORIDA, 33433

TAX ID: 81-4208066


7. HELLENIC SHIPPING MANAGEMENT LLC

PHYSICAL ADDRESS: 9858 GLADES ROAD; SUITE 219, BOCA RATON, FLORIDA, 33433

TAX ID: 81-4208066

# EXHIBIT B

{2387/000/00523486}

# Future Receipts Sale Agreement.



42 Broadway St. 1815, NYC, NY 10004
Contact@gofreshfunding.com
(888) 355-4352



# FUTURE RECEIPTS SALE AGREEMENT

*This Future Receipts Sale Agreement ("Agreement") dated above, is made on _____ 2021 by and between Fresh Funding Solutions, Inc, a Delaware corporation (together with its successors and/or assigns, "Purchaser"), Merchant, and Principal(s) (as defined below).*

**MERCHANT INFORMATION:**

| | |
|---|---|
| **Merchant Legal Name ("Merchant"):** | Hellenic Petroleum LLC |
| **DBA Name:** | |
| **Tax ID:** | 81-4208066 |
| **Type of Entity:** | Corporation |
| **Physical Address:** | 7000 W Palmetto Park Rd STE 302 Boca Raton, FL 334 |

**PRINCIPAL(S) INFORMATION:**

| | |
|---|---|
| **Name of Principal (1):** | PANAGIOTIS KECHAGIAS |
| **Address:** | 7000W Palmetto Park Rd STE302 Boca Raton,FL33433, |
| **SSN:** | ███████ |
| **Name of Principal (2):** | |
| **Address:** | |
| **SSN:** | |

**KEY TERMS**

| | |
|---|---|
| **Purchase Price:**<br>The dollar amount Purchaser is paying for the Amount Sold. | $200,000 |
| **Monthly Percentage:**<br>The maximum percentage of Future Receipts generated during a calendar month that Merchant authorizes Purchaser to collect for that calendar month. | 25% |
| **Collected Amount:**<br>The amount of funds arising from Future Receipts that Merchant authorizes Purchaser to collect each business day or week, as indicated here       . | $2,500 daily<br>see Appendix A for early payoff option |
| **Amount Sold:**<br>The dollar value of the Future Receipts being sold. | $300,000 |
| **Processing Fee:** | $10,000 |

**The following Terms and Conditions, including the Arbitration provision set forth in Section 13 below, govern this agreement**

**Please initial here on behalf of Merchant: X  _____**


1. **Purchase and Sale of Future Receipts**. In consideration of the payment of the Purchase Price specified above, Purchaser purchases from Merchant, and Merchant sells to Purchaser, the Amount Sold of Merchant's future accounts and contract rights to all payments to be made in any form (including, but not limited to, cash, check, payment card and electronic fund transfer) arising from or relating to the sale of goods and/or services to Merchant's customers ("Future Receipts"). Merchant agrees that this Agreement applies to Merchant's entire right, title and interest in the Future Receipts up to the Amount Sold. Merchant and Purchaser agree that this sale and purchase is final and Merchant has no right to repurchase or resell the Future Receipts or any portion thereof unless both parties agree to it in writing. Merchant, each Principal signing this Agreement and Purchaser (each individually referred to herein as "Party" and collectively referred to herein as "Parties") agree that the Purchase Price paid to Purchaser is the price paid to purchase Merchant's Future Receipts and that the transaction contemplated by this Agreement is a purchase and sale of the Future Receipts. The Parties hereby agree that the transaction contemplated by this Agreement is not a loan, a forbearance of money lent or any similar credit transaction. Merchant understands, agrees and represents that this transaction is made for business or commercial purposes only.

2. **Timing, Method of Payment, Processing Trial**. Merchant and Purchaser agree that Purchaser shall pay the Purchase Price or any portion thereof to Merchant only at a time, and through a method, acceptable to Purchaser and at Purchaser's sole discretion. Merchant and Purchaser also agree that Purchaser, in its sole discretion, may refuse to pay the Purchase Price or any portion thereof to Merchant and cancel this Agreement at any time prior to the Purchase Price being paid.

3. **Waiver**. There shall be affected no waiver by failure on the part of Purchaser to exercise, or delay in exercising, any right under this Agreement, nor shall any single or partial exercise by Purchaser of any right under this Agreement preclude any other future exercise of any right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4. **Authorization to File Notice of Sale and Security Interest**. Merchant hereby authorizes Purchaser to file a financing statement pursuant to the Uniform Commercial Code (UCC) to evidence the sale of the Future Receipts. The UCC financing statement may state that the sale of the Future Receipts is intended to be a sale and not an assignment for security. Merchant and each Principal agrees to execute any documents or take any action in connection with this Agreement that Purchaser deems necessary to perfect or maintain Purchaser's interest in the Future Receipts purchased pursuant to this Agreement.

5. **Fees and Damages**.
(a) **Processing Fee**. Merchant agrees to pay Purchaser the Processing Fee provided for in this Agreement to reimburse Purchaser for
(i) expenses Purchaser incurs in originating and processing the transaction, including expenses for, among other things, processing Merchant's application, filing and terminating UCC financing statement(s) against Merchant and (ii) fees that Purchaser pays any other person for referring Merchant to Purchaser and assisting with the origination of the transaction. Purchaser may, at its sole option, deduct the amount of the Processing Fee from the Purchase Price that is to be paid to Merchant. Because this transaction is not a loan, Purchaser does not charge any finance charges, late fees or other similar type fees.
(b) **Bank Wire Fee**. Merchant may request to receive payment of the Purchaser Price by wire transfer. Purchaser shall have sole discretion in determining whether it will pay the Purchase Price by wire transfer. In the event Purchaser pays the Purchase Price by wire transfer, Merchant agrees to pay Purchaser a fee of $35, which covers the administrative, technological, and banking costs. Purchaser may, at its sole option, deduct the amount of the Bank Wire

Please initial here on behalf of Merchant: X _____



Fee from the Purchaser Price that is to be paid to Merchant. Because this transaction is not a loan, Purchaser does not charge any finance charges, late fees or other similar type fees.

6.      **Right to Cancel**. Merchant may cancel this transaction at any time prior to midnight of the fifth Business Day after Purchaser forwards the Purchase Price to Merchant. In order to cancel the transaction, Merchant must return the full Purchase Price to Purchaser within five days of receipt of the Purchase Price.

7.      **Merchant's Representations, Warranties and Covenants**. Merchant represents, warrants and covenants that as of the date and during the term of this Agreement:
(i) without the prior written consent of Purchaser, Merchant will not (a) conduct business under any name other than as disclosed herein, (b) change its business location or (c) temporarily close its business for renovations or other purposes;

**Please initial here on behalf of Merchant: X** _____

(ii) Merchant will not voluntarily permit another person or company, including without limitation a franchisor company (if Merchant is a franchisee), to assume or take over the operation and/or control of Merchant's business or business locations; (iii) all information provided by Merchant to Purchaser in this Agreement, application, interview with Purchaser or otherwise and all of Merchant's financial statements and other financial documents provided to Purchaser are true, correct, complete and accurately reflect Merchant's financial condition and results of operations at the time such materials were provided to Purchaser and Merchant will promptly, but in no event later than ten (10) calendar days, advise Purchaser of any material change in Merchant's financial condition or operations; (iv) Merchant will possess and maintain insurance in such amounts and against such risks as are necessary to protect its business and shall show proof of such insurance upon demand; (v) Merchant is in compliance with all laws applicable to Merchant's business and has all permits, licenses, approvals, consents and authorizations necessary to conduct its business and will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes; (vi) Merchant is a chapter 11 debtor in possession in a case pending before the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), and, subject to the approval of the Bankruptcy Court following notice and a hearing, Merchant and the person(s) signing this Agreement on behalf of Merchant have full power and authority to enter into and perform the obligations under this Agreement; (vii) Merchant will not commit fraud; (viii) Merchant will provide Purchaser copies of all documents related to Merchant's card processing activity or financial and banking affairs within five (5) days of a request by Purchaser; and (ix) Merchant will permit Purchaser to conduct a site inspection of Merchant's business, including an inspection of Merchant's credit card terminals, at any reasonable time during the term of this Agreement without Notice to Merchant.  Merchant also represents, warrants and covenants that as of the date of this Agreement,

8.      **Monthly Reconciliation**.

Merchant agrees that due to the various sources of future receipts to which Purchaser does not have access,including but not limited to credit card receivables, it is impossible for Purchaser to know the accurate amount of Merchant's future receipts in any given calendar month without first obtaining said information from Merchant. Merchant therefore agrees that it is Merchant's sole responsibility to notify Purchaser if the total                         Amounts collected by or delivered to Purchaser for any given calendar month exceeds the Monthly Percentage of Future

**Please initial here on behalf of Merchant: X _____**



Receipts generated for that calendar month ("Overage") by sending the complete bank statement for the Approved Account for that calendar month and any other information that Purchaser may require to Purchaser's designated email address (contact@gofreshfunding.com) (the "Designated Email") by the 15th day of the following month ("Reconciliation Notice"). If Merchant provides a timely Reconciliation Notice to Purchaser at the Designated Email, Purchaser will review, and if Purchaser determines there is an Overage, will reconcile Merchant's Approved Account by initiating an ACH credit to the Approved Account in an amount equal to the Overage ("Monthly Reconciliation"). If the Merchant obtains a Monthly Reconciliation in two successive months, the Merchant may apply, via the Designated Email, for a downward adjustment of the Collected Amount so that the Collected Amount withdrawn is consistent with the Monthly Percentage. If Merchant does not provide a timely Reconciliation Notice to the Designated Email, Merchant hereby waives its rights to any Monthly Reconciliation for that calendar month.

9.      **Telephone Monitoring, Recording and Contacts**. Purchaser may choose to monitor and/or record telephone calls with Merchant, Merchant's representatives and each Principal. These calls are monitored and/or recorded for training, compliance, collections, quality control and other legal purposes. By signing this Agreement, Merchant and each Principal agrees that any call between Purchaser and Merchant, Merchant's representatives and each Principal may be monitored and/or recorded. Merchant and each Principal further agree that: (i) each has an established business relationship with Purchaser and may be contacted from time to time regarding transactions with Purchaser by any method of communication, including, but not limited to, telephone, fax, text message or email; (ii) such contacts are not considered unsolicited or inconvenient; and (iii) any such contact may be made using any wireless, mobile cellular or other number Merchant, Merchant's representative or any Principal gives Purchaser, using any e-mail address Merchant, Merchant's representative or any Principal gives Purchaser, or using an automated dialing and announcing or similar device, unless prohibited by law. This authorization is binding upon Merchant and each Principal

upon signing this Agreement and shall not be deemed withdrawn or revoked should Purchaser determine not to purchase the Future Receipts from Merchant.

10.      **Miscellaneous**. This Agreement shall be binding upon Merchant and inure to the benefit of Purchaser, its successors and assigns. This Agreement constitutes the entire Agreement between the Parties, and no representations, agreements, or understandings of any kind, either written or oral, shall be binding upon the Parties unless expressly contained herein. This Agreement is a complete and exhaustive statement of the terms of the Parties' agreement, which may not be explained or supplemented by evidence of consistent or inconsistent additional terms or contradicted by evidence of any prior or contemporaneous agreement. The Parties may change any of the terms of this Agreement or amend this Agreement but any such changes or amendments shall not be effective unless they are in writing and signed by all Parties, and approved by the Bankruptcy Court. If any of the provisions of this Agreement are determined to be invalid, illegal or unenforceable in any respect, the remaining provisions shall not be affected in any manner. All Parties hereby acknowledge having the full power and authority to enter into and perform the obligations under this Agreement, subject to the approval of the Bankruptcy Court. The Parties agree to execute such further and additional documents, instruments, and writings as may be necessary, proper, required, desirable, or convenient for the purpose of fully effectuating the terms and provisions of this Agreement. The signatures to this Agreement may be evidenced by facsimile copies or other electronic means reflecting the Party's signature hereto, and any such copy or signature shall be sufficient as if it were an original signature. Sections 9, 10, 11, 12, 13, 14, 18, 19, 21 and 23 through 28 shall survive any termination, satisfaction or cancellation of this Agreement.

11.      **Litigation and Consent to Jurisdiction and Venue**. All Parties have the right to seek adjudication in the Bankruptcy Court for disputes arising from this Agreement. The Parties hereby agree that the exclusive venue for all such disputes shall be the Bankruptcy Court. No court action may be brought in any other state or jurisdiction except as necessary to enforce a valid security interest or enforce a judgment entered in the State of New York. Merchant and each Principal (i) waive any claim against or objection to the in personam jurisdiction and venue in the Bankruptcy Court.

**Please initial here on behalf of Merchant: X _____**



NO CLAIM FILED IN COURT WILL BE HEARD BY A JURY AND ANY CLAIM WILL TAKE PLACEON AN INDIVIDUAL BASIS; CLASS ACTIONS ARE NOT PERMITTED. NO COURT MAY ORDER, PERMIT OR CERTIFY A CLASS ACTION, REPRESENTATIVE ACTION, PRIVATE ATTORNEY - GENERAL LITIGATION OR CONSOLIDATED ACTION. NO COURT MAY ORDER OR PERMIT A JOINDER OF PARTIES, UNLESS BOTH MERCHANT AND PURCHASER CONSENT TO SUCH JOINDER IN WRITING.

12.      **(Stricken)**

13.      **(Stricken)**.

**Please initial here on behalf of Merchant: X** _____



14.     **Covenant Not To Sue**.

(a)     Merchant and Principal(s) agree that they will never institute, prosecute or in any way aid in the institution or prosecution of any claim, demand, action, or cause of action at law or in equity against Purchaser or any Affiliated Entity for a claim that this Agreement is a contract of adhesion, a claim of usury, a claim that Purchaser is required to have any lending license, a claim that the difference between the Purchase Price and Amount Sold is interest, or any other claim contending that the Purchase Price paid by Purchaser in exchange for the Amount Sold of Future Receipts is, or should be construed as, a loan from Purchaser to Merchant. Nothing in this section is intended to prevent Merchant or Principal from complying with any lawfully issued subpoena or court ordered discovery.

**Please initial here on behalf of Merchant: X _____**


(b)      This Section 14 is a covenant not to sue, and not a release. In the event that Merchant or any Principal breaches or in any way violates the terms of this Section 14, Merchant and Principal(s) jointly and severally agree to indemnify Purchaser for all damages arising from that breach, including without limitation the payment of all costs and expenses of every kind for the enforcement of Purchaser's rights and remedies under this section, including any and all attorneys' fees and costs in any trial court or appellate court proceeding, any administrative proceeding, any arbitration or mediation, or any negotiations or consultations in connection with breach of this section.

(c)      This covenant shall inure to the benefit of Purchaser and each Affiliated Entity, and shall bind Merchant, Principal(s) and their respective successors and/or assigns, any of their respective affiliated or subsidiary companies, partners, owners, joint venturers, investors, heirs, executors, administrators, or anyone claiming on their behalf, and/or any of Merchant's managers, directors, officers, employers or agents.

15.      **Collection of Receipts**. As provided herein, Purchaser shall collect the Collected Amount of Future Receipts by Merchant paying to Purchaser the Collected Amount in the manner specified herein.

16.      **Financial Condition and History**. Merchant and each Principal authorized Purchaser and its agents to investigate their financial condition and history and authorize each of Merchant's card processors to provide Purchaser with Merchant payment card and check processing activity statements and any other information on Merchant upon Purchaser's request. Merchant will provide to Purchaser within five (5) days of a request by Purchaser any documents relating to Merchant's financial condition and history including, but not limited to, Merchant's bank statements, financial statements, tax returns and payment card and check processing activity statements. A photocopy of this authorization will be deemed acceptable for release of financial information. Merchant shall give Purchaser advance written notice of not less than seven (7) business days prior to any bankruptcy filing involving Merchant. Merchant shall give Purchaser advance written notice of not less than seven (7) business days prior to the closing of any sale of all or substantially all of Merchant's assets or ownership interests, and such notice shall not constitute a waiver of Purchaser's rights pursuant to such sale, which Merchant agrees constitutes a breach of this Agreement. Merchant shall promptly, but in no event later than ten (10) calendar days, give Purchaser written notice of any other material adverse changes in Merchant's financial condition.

17.     **Remedies**. In the event Merchant breaches any of the provisions of this Agreement, including but not limited to the representations, warranties and covenants made herein, Purchaser shall be entitled to all remedies available under law. In any action for damages, Purchaser shall be entitled to damages equal to the Amount Sold less the amount of funds arising from Future Receipts received by Purchaser ("Uncollected Amount Sold"). Merchant and each Principal signing this Agreement hereby agree that Purchaser may electronically debit from any of Merchant's or each Principal's bank accounts via ACH or otherwise all or any portion of the Uncollected Amount Sold or may instruct Merchant's card processor to forward to Purchaser all or any portion of the Uncollected Amount Sold and any other amounts that Merchant owes Processor pursuant to this Agreement if Merchant breaches this Agreement. Purchaser is purchasing the Future Receipts at a discount. Because the transaction evidenced by this Agreement is not a loan, if Merchant's business slows down and Merchant's Future Receipts decrease or if Merchant closes its business or ceases to process payment devices and Merchant has not violated any of the representations, warranties and covenants in this Agreement, there shall be no default or breach of this Agreement. Purchaser is purchasing the Future Receipts and Purchaser assumes the risk that Merchant's business may fail or be adversely affected by conditions outside the control of Merchant provided Merchant has not breached a representation, warranty or covenant set forth in this Agreement.

18.     **Attorney's Fees and Costs**. To the extent not prohibited by applicable law, if any Party files a Claim against another Party

the prevailing Party on the Claim shall be

entitled to collect all court or arbitration costs and reasonable attorneys' fees incurred in pursuing the Claim. If no monetary damages are awarded, no attorney's fees or costs shall be awarded. To the extent not prohibited by applicable law, if a Party files a Claim against another Party and the Claim is dismissed or the defending Party prevails in the matter, the Party filing the Claim shall pay the defending Party's reasonable attorneys' fees and costs incurred in defending the matter.

19.     **Reporting**. By signing this Agreement, Merchant and each Principal authorizes Purchaser to obtain a credit report or background report on Merchant and each individual or Principal that signs this Agreement at any time during the term of this Agreement and 90 days after the term of this Agreement. The report(s) Purchaser obtains may include, but is not limited to, the business' or individuals' credit history or similar characteristics, employment and education verifications, social security verification, criminal and civil history, Department of Motor

**Please initial here on behalf of Merchant: X _____**


Vehicle records, any other public records, and any other information Purchaser deems relevant. If additional authorizations are required, Merchant and each Principal agrees to execute such additional authorization(s) required to enable Purchaser to obtain such reports.

20.      **Debt Settlement and Similar Services**. Merchant and each Principal waive any right during the term of this Agreement to third party representation with respect to this Agreement, and agrees not to enter into any agreement with, engage with, or otherwise use the services of a third party, including attorneys or law firms, that offers the following services: debt restructuring services, debt settlement services, debt management services, debt balance reduction services, creditor reduction services, creditor negotiation services, financial mitigation services, turnaround consulting services and/or any similar services. Merchant agrees to notify Purchaser within 24 hours of Merchant's receipt of any solicitation from any third party (i) offering the services described in this Section 23 or (ii) attempting to induce Merchant to breach the terms of this Agreement. Merchant shall include with the notice to Purchaser the name and contact information of the third party and a copy of any written solicitation materials provided by the third party to Merchant.

21.      **FULL PAYMENT DUE UPON SALE**. If Merchant undertakes or enters into any transaction involving the sale of Merchant, either by issuance, sale, or transfer of ownership interests in Merchant that results in a change in ownership or voting control of Merchant, or by a sale or transfer of substantially all of the assets of Merchant, then the outstanding balance of the Amount Sold is due and payable immediately in full.

22.      **Other entities**. In the event Merchant's Principal(s) including but not limited to its officer(s) or Director(s), during the term of this agreement or while Merchant remains liable to Purchaser for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causesto to be formed a new entity or otherwise  becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due Purchaser under this agreement. With respect to any such entity, Purchaser shall be deemed to have been granted anirrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and

all appropriate UCC filing offices. Purchaser shall be held harmless by Merchant and its Principals and be relieved of any liability as a result of Purchaser's authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. Purchaser Shall Have the right to notify such entity's payors or Account Debtor  (as defined by the Uniform Commercial Code) of Purchaser's rights, including without limitation, Purchaser's right to collect all Accounts, and to notify any creditor of such entity that Purchaser has such rights in such entity's assets. Merchantalso agrees that, at the Purchaser's discretion, Purchaser may choose to amend the UCC Financial Statement to include any newly formed entity that is considered to be in an active state from the date hereof.

23.      **Security Interest**. To secure Merchant's performance obligations to Purchaser under this Agreement, Merchant hereby grants to Purchaser asecurity interest in (a) all account, chattel paper, documents, equipment, general intangibles, instruments, and inventory as those terms are defined in article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant; and (b) all proceeds, as that term is defined in Article 9 of the UCC (c) Paypal, Venmo, Square, Stripe, CashApp, Wepay, Joist, or any other online payment processing account or BitCoin processing account (a, b and c collectively,  the "Collateral").

24.  **Cross-Collateral**. To secure Merchant's payment and performance obligations to Purchaser under this Agreement, Merchant hereby grants Seller a security interest in  See Appendix B
(the "Additional Collateral"). Merchant understands that Purchaser will have a security interest in the aforesaid additional collateral upon execution of this agreement.

25.  Merchant acknowledges and agrees that any security interest granted to Purchaser under any other agreement between Merchant and Purchaser (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement.

26.      **Further Authorization**. Merchant agrees to execute any documents or take any action in connection with this Agreement as Purchaser deems necessary to perfect or maintain Purchaser's first priority security interest in the collateral, the additional collateral and the Cross-Collateral, including the execution of any account control agreements. Merchant hereby authorizes Purchaser to file any financing statements deemed necessary by Purchaser to perfect or maintain Purchaser's security interest, which financing

**Please initial here on behalf of Merchant: X  _____**



statement may contain notification that Seller has granted a negative pledge to Purchaser with respect to the collateral, the Additional Collateral and the Cross Collateral, and that any subsequent lien or may be tortiously interfering with Purchaser's rights. Merchant shall be liable for and Purchaser may charge and collect all costs and expenses, including but not limited to attorney's fees which may be incurred by Purchaser in protecting, preserving and enforcing PURCHASER's security interest and rights.

27.     **Definitions and Interpretation**. "Merchant" shall be interpreted to include Merchant and each Principal unless such interpretation would be redundant or inapplicable. Purchaser shall exclusively decide how "Merchant" shall be interpreted in any ambiguous references. All Section headings in this Agreement are inserted for convenience only and are not intended to affect the interpretation of the Agreement.

28.     **Construction**. No provision of this Agreement shall be construed or enforced against any Party hereto because such Party drafted or caused to be drafted such provision. Each provision of this Agreement shall be construed as if such provision had been proposed and drafted or caused to be drafted by all Parties hereto.

29.     **Limitation of Liability**. The Parties agree that in no event shall Purchaser's total liability to Merchant and any Principal, regardless of the cause of action  orcharacter or type of damages sought, exceed the Amount Sold less the Purchase Price.

30.     **(Stricken)**.

31.     **(Stricken).**

36.     **WAIVER OF JURY TRIAL**. EXCEPT TO THE EXTENT PROHIBITED BY APPLICABLE LAW OR

**Please initial here on behalf of Merchant: X _____**

 **FRESH FUNDING**

DEEMED TO BE AGAINST PUBLIC POLICY, MERCHANT, PRINCIPAL(S) AND PURCHASER HEREBYKNOWINGLY, VOLUNTARILY, INTENTIONALLY, WITHOUT DURESS AND AFTER DISCUSSING OR HAVING THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH ITS ATTORNEY, WAIVES THE RIGHT TOA TRIAL BY JURY WITH RESPECT TO ANY CONTROVERSY, DISPUTE, OR CLAIM, INCLUDING ALL CLAIMS SOUNDING IN CONTRACT OR TORT, ARISING FROM OR RELATING TO (A) THIS AGREEMENT OR ANY TRANSACTION DOCUMENT,

(B) ALL PAST, PRESENT, AND FUTURE AGREEMENTS INVOLVING THE PARTIES, (C) ANY TRANSACTION CONTEMPLATED BY THIS AGREEMENT OR THE TRANSACTION DOCUMENTS, AND ALL PAST, PRESENT, AND FUTURE TRANSACTIONS INVOLVING THE PARTIES, AND (D) ANY ASPECT OF THE PAST, PRESENT, OR FUTURE RELATIONSHIPS OF THE PARTIES. THIS WAIVER OF TRIAL BY JURY PROVISION IS A MATERIAL INDUCEMENT FOR PURCHASER TO ENTER INTO THIS AGREEMENT.

37.     **(Stricken)**.

38.     **WAIVER OF CLASS ACTION**.
(a)     MERCHANT AND PRINCIPAL(S) HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT TO BRING A CLASS ACTION, WHETHER AS A CLASS REPRESENTATIVE OR A CLASS MEMBER, AGAINST PURCHASER OR ANYAFFILIATED ENTITY BASED ON ANY CONTROVERSY, DISPUTE, OR CLAIM, INCLUDING ALL CLAIMS

SOUNDING IN CONTRACT OR TORT, ARISING FROM OR RELATING TO (A) THIS AGREEMENT OR ANY TRANSACTION DOCUMENT; (B) ANY AGREEMENTS INVOLVING MERCHANT OR ANY PRINCIPAL, AND PURCHASER, (C) ANY TRANSACTION CONTEMPLATED BY THIS AGREEMENT OR ANY OTHER DOCUMENTS, INSTRUMENT OR AGREEMENTS INVOLVING MERCHANT OR ANY PRINCIPAL, AND PURCHASER, OR (D) ANY ASPECT OF ANY RELATIONSHIPS OF MERCHANT OR ANY PRINCIPAL, AND PURCHASER. THIS WAIVER OF CLASS ACTION PROVISION IS A MATERIAL INDUCEMENT FOR PURCHASER TO ENTER INTO THIS AGREEMENT.

(b)     Purchaser, Merchant, and Principal(s) agree that all issues and disputes related to this Section 39, including but not limited to the meaning, construction, validity, scope and/or enforceability of this Section 39, shall be decided by an arbitrator pursuant to Section 13 of this Agreement. In the event that this Section 39 is determined to be illegal or unenforceable, Purchaser, in its sole discretion, shall elect whether any class action against it shall be brought in a judicial proceeding pursuant to Section 11 of this Agreement or in arbitration pursuant to Section 13 of this Agreement.

39.     **(Stricken)**.

40.     **Notices**. Each Party giving or making any notice, request, demand or other communication (each, a "Notice") pursuant to this Agreement shall give the Notice in writing and use one of the following methods of delivery, each of which for purposes of this Agreement is a writing: personal delivery, registered or certified mail (in each case, return receipt requested and postage prepaid), or nationally recognized overnight courier (with all fees prepaid). Any Party giving a Notice shall address the Notice to the receiving Party at the address set forth on the face of this Agreement or to another address as designated by a Party in a Notice pursuant to this section. Any Party changing its address or any other contact information after  the execution and delivery of this Agreement shall provide Notice to all other Parties. For a change of address only, a Party may provide Notice by email or facsimile, but such Notice is not effective unless receipt is acknowledged by the recipient. All Notices to a Principal shall be addressed

**Please initial here on behalf of Merchant: X _____**

**FRESH FUNDING**

to the Principal in care of Merchant unless such Principal has provided Notice to Purchaser after the date of this Agreement directing that Notices to such Principal are to be delivered to a different address. Except as otherwise provided herein, a Notice is effective only if the Party giving the Notice has complied with this Section 41, and the

addressee has received the Notice. If the addressee rejects or otherwise refuses to accept the Notice, or if the Notice cannot be delivered because of a change in address for which no Notice was given, then such Notice shall be deemed to have been received upon the rejection, refusal or inability to deliver.

EACH PARTY ACKNOWLEDGES THAT THEY HAVE READ, AGREE AND UNDERSTAND THE AGREEMENT AND SHALL BE OBLIGATED UPON EXECUTION OF THE AGREEMENT TO ALL OF THE FOREGOING TERMS AND CONDITIONS INCLUDING THE AUTHORIZATION AGREEMENT FOR DIRECT DEPOSITS (ACH CREDITS) AND DIRECT PAYMENTS (ACH DEBITS) AND ANY OTHER EXHIBITS, ADDENDUMS OR SCHEDULES THAT MAY BE ADDED OR ATTACHED HERETO. The person executing this Agreement on behalf of Merchant warrants and represents that he/she is authorized to bind Merchant to all of the terms and conditions set forth in this Agreement and that all of the information provided herein is true and accurate in all respects. Purchaser's payment of the Purchase Price shall be deemed Purchaser's acceptance of this Agreement, notwithstanding Purchaser's failure to sign this Agreement.

**ANY MISREPRESENTATION MADE BY MERCHANT OR ANY PRINCIPAL IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE FRAUD OR INTENTIONAL MISREPRESENTATION.**

Hellenic Petroleum LLC

**Principal 1 (Individually)**

Signature: X _____

Signature: X _____

Name: PANAGIOTIS KECHAGIAS

Name: PANAGIOTIS KECHAGIAS

Title: Owner

Date: _____

Date: _____

**Principal 2 (Individually)**

Signature: X _____

Name: _____

Date: _____

_____

**Please initial here on behalf of Merchant: X _____**

## VALIDITY GUARANTEE ADDENDUM

In consideration of the Purchaser entering into this Agreement, and in order to induce the Purchaser to enter into this Agreement, each of the undersigned Merchant and principal(s) of Merchant (such principals, whether officers, shareholders, partners, other owners or others are referred to herein as the "Validity Guarantors"), hereby personally assumes and, jointly and severally, guarantees, the truth, accuracy and completeness of all of the Merchant's the representations, warranties and covenants set forth in this Agreement (collectively, the "Guaranteed Obligations"). In such instance, Validity Guarantors shall perform under this Agreement, including, without limitation, paying, or causing to be paid, any amounts that Purchaser would otherwise be entitled to collect from Merchant under the terms of this Agreement, immediately, upon notice from Purchaser describing Merchant's violation(s) of the representations, warranties and/or covenants set forth in this Agreement in summary form. Validity Guarantors' joint and several obligation to perform includes, without limitation, upon Merchant's breach of any representation, warranty and/or covenant, Purchaser's right to damages equal to the amount by which the cash attributable tothe Purchased Amount exceeds the amount of collections received by Purchaser from Receivables pursuant to Section 16 of the Agreement, without any presentment or demand made by the Purchaser. In the event of a default by any Validity Guarantor, each Validity Guarantor agrees that Purchaser may report such default to one or more credit bureaus. Each Validity Guarantor acknowledges that it will directly benefit from Purchaser and Merchant entering into the Purchase Agreement.

This Guaranty shall be a guarantee of performance of Merchant's representations, warranties and covenants, and not a guarantee of collection. Validity Guarantors hereby waive demand of payment, notice and presentment, and agree that Purchaser may proceed to enforce its rights against each Validity Guarantor or any other guarantor of Merchant's obligations from time to time, prior to, contemporaneously with or after any enforcement against Merchant, or without any enforcement against Merchant. The obligations of Validity Guarantors are unconditional, absolute and irrevocable, and shall remain in full force and effect and without regard to, and shall not be released, discharged or in any way affected by, (a) any amendment to this Agreement; (b) any exercise or non- exercise of or delay in exercising any right, remedy, power or privilege under or in respect of this Agreement; (c) any bankruptcy, insolvency, arrangement, composition, assignment for the benefit of creditors, or similar proceeding commenced by or against the Merchant or any of its officers, directors or principals; (d) defects in the formation or authority of Merchant; or (e) any other circumstance that might otherwise constitute a legal or equitable discharge ofa guarantor or surety. Validity Guarantors each further jointly and severally guarantee payment of all costs, expenses and attorneys' fees and disbursements which may be incurred by Purchaser in connection with the Guaranteed Obligations, or any Validity Guarantor's default of its obligations under this Agreement. If payment of any sum by Merchant is recovered as a preference of fraudulent conveyance under any bankruptcy or insolvency law, the liability of Validity Guarantors under this Guaranty shall continue and remain in full force and effect notwithstanding such recovery.

Each Validity Guarantor authorizes, acknowledges and agrees that, in connection with the execution of this Agreement, investigative and/or consumer reports may be obtained with respect to the Merchant and Validity Guarantor(s). The reports Purchaser obtains may include, but are not limited to, the Merchant's or Validity Guarantors' respective credit histories or similar characteristics, employment and education verifications, social security verification, criminal and civil history, Department of Motor Vehicle records, any other public records, and any other information bearing on credit standing or credit capacity. Accordingly, each Validity Guarantor authorizes the Purchaser, its agents and representatives and any credit reporting agency employed by the Purchaser to investigate any references given or any other statements of data obtained from or about the Merchant or any of its principals for the purpose of this Agreement and to obtain credit reports at any time now or in the future with respect to the Validity Guarantors. The Validity Guarantors to this Agreement are hereby notified that a negative creditreport reflected on his/her credit record may be submitted to a credit reporting agency if the provisions of this Guaranty are triggered by a violation by the Merchant.

Without limiting the generality of the foregoing, the Merchant and the Validity Guarantors shall not assert, raise, plead or enforce against Purchaser any defense of waiver, release, res judicata, statue of fraud, anti-deficiency statute, fraud, incapacity, minority, usury, illegality or unenforceability which may be available to the Merchant and the Validity Guarantors or any other person or entity liable in respect of any or all of the obligations under this Agreement, or any set off available against Purchaser to the Validity Guarantors or any other such person, or entity whether or not on account of a related transaction. Merchant and Validity Guarantors shall also not assert, raise, plead or enforce against Purchaser any time-based defenses, including, but not limited

**Please initial here on behalf of Merchant: X _____**

to, laches or any applicable statute of limitations, and Merchant and Validity Guarantors hereby expressly waive any and all such defenses and hereby fully and expressly acknowledge the obligations and indebtedness stated herein.

Hellenic Petroleum LLC

**Validity Guarantor 1 (Individually)**

Signature: X _____

Signature: X _____

Name: ___PANAGIOTIS  KECHAGIAS_____

Name: ___PANAGIOTIS  KECHAGIAS_____

Title: ___Owner_____

Date: _____

Date: _____

**Validity Guarantor 2 (Individually)**

Signature: X _____

Name: _____

Date: _____

**Please initial here on behalf of Merchant: X _____**

## REPURCHASE OPTION ADDENDUM

In consideration of the premises and the mutual representations, covenants, undertakings and agreements hereinafter contained Merchant and Purchaser agree that Merchant will have the option to repurchase the receivables according to the following schedule:

| Early Repurchase Date | Updated Purchased Amount |
|---|---|
| December 31, 2021 | $270,000 |
| | |
| | |

Hellenic Petroleum LLC                                    **Fresh Funding Solutions, Inc.**

Signature:  X _____          Signature:  X _____

Name:  __PANAGIOTIS  KECHAGIAS__           Name:  _____

Title:  ___Owner_____           Title:  _____

Date:  _____           Date:  _____

**Please initial here on behalf of Merchant: X _____**

**Appendix A:** Fresh Funding Weekly Payment Schedule

| Week | 1-4 | 5-8 | 9-12 | 13-16 | 17-20 | 20-23 | 24-27 |
|------|------|------|------|-------|-------|-------|-------|
|  |  |  |  |  |  |  |  |
|  | $1,446.43 | $2892.86 | $7,232.14 | $9,642.86 | $12,253.72 | $14,464.28 | $19,285.72 |
|  |  |  |  |  |  |  |  |

**Appendix B- ADDITIONAL ENTITIES SUBJECT TO THE TERMS OF THIS CONTRACT**

1.  HELLENIC PETROLEUM, LLC.
PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433 TAX ID: 81-4208066
2. HELLENIC SEAS HOLDINGS INC
PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433 TAX ID: 81-4208066
3. CONSOLIDATED RESOURCES, INC
PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433 TAX ID: 81-4208066
4. MYKONOS GREEK BISTRO, LLC.
PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433 TAX ID: 81-4208066
5. HELLENIC MANAGEMENT LLC
PHYSICAL ADDRESS: 9858 GLADES ROAD; SUITE 219, BOCA RATON, FLORIDA, 33433 TAX ID: 81-4208066
6. CAPITAL TRADE FINANCE LLC
PHYSICAL ADDRESS: 9858 GLADES ROAD;SUITE 219, BOCA RATON, FLORIDA, 33433 TAX ID: 81-4208066
7. HELLENIC SHIPPING MANAGEMENT LLC
PHYSICAL ADDRESS: 9858 GLADES ROAD; SUITE 219, BOCA RATON, FLORIDA, 33433 TAX ID: 81-4208066
8. 1930 N FEDERAL HWY LLC
PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433 TAX ID: 81-4208066
9. BALUX RESTAURANT LLC
PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433 TAX ID: 81-4208066
10. BOCA DOMA LLC
PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433 TAX ID: 81-4208066
11. CAPITAL TRADE FINANCE LLC
PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433 TAX ID: 81-4208066
12. CONSOLIDATED RESOURCES INC
PHYSICAL ADDRESS: 4640 S VALLEY VIEW BLVD STE D, LAS VEGAS, NV 89103
13. GOODFELLAS CIGAR LOUNGE LLC
PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433
14.ONEOIL BUNKERING LLC
PHYSICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433

# EXHIBIT C



# GLOBAL FUNDING EXPERTS

**2701 QUEENS PLAZA NORTH, SUITE 802, LONG ISLAND CITY, NY 11101**
**Tel: 1-877-253-7686, Fax: 718-504-3736**
**Website: www.globalfundingexperts.com / Email: underwriting@globalfundingexperts.com**

---

## MERCHANT AGREEMENT

Agreement dated_____between GFE NY, LLC (**"GFE"**) and the Merchant listed below (**"MERCHANT"**)
_____(Month) (Day) (Year)_____

### MERCHANT INFORMATION

| | |
|---|---|
| Merchant's Legal Name: | HELLENIC PETROLEUM, LLC. |
| D/B/A: | HELLENIC PETROLEUM, LLC. |
| State of Incorporation / Organization: | FL |
| Type of Business Entity: | LLC |
| Federal EIN: | 81-4208066 |
| Physical Address: | 7000 WEST PALMETTO PARK ROAD, SUITE 302, Boca Raton, FL, 33433 |
| Mailing Address: | 7000 WEST PALMETTO PARK ROAD, SUITE 302, Boca Raton, FL, 33433 |
| Primary Contact & Number: | PANAGIOTIS KECHAGIAS (561-414-1632) |

### PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant"), in consideration of the funds provided to Merchant by GFE as specified below ("Purchase Price"), hereby sells, assigns and transfers to GFE (making GFE the absolute owner) the Specified Percentage indicated below of all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts") defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business, for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to GFE.

The Purchased Amount shall be paid to GFE by Merchant irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to and pre-approved by GFE (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as GFE receives payment in full of the Purchased Amount. Merchant shall pay the specified remittance amount to GFE during a business day based on the frequency outlined herein below in the "Specified Remittance Amount & Frequency" box. The Merchant shall deliver to GFE, no later than the 18th date of each month the bank statement for the Account in respect of the immediately preceding month. Within three business days of GFE's receipt of the Merchant's monthly bank statements, GFE shall reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the Specified Percentage. If the Merchant fails to deliver the bank statement for the Account for any month, GFE shall consider that the specific remittances were equal to the Specified Percentage of the settlement amount due from each Transaction for such month. GFE may, upon Merchant's request, adjust the amount of any payment due under this Agreement at GFE's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between GFE and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

### PROMOTIONAL EARLY TERMINATION DISCOUNT OFFER:

| | | | |
|---|---|---|---|
| Total Purchase Price: | $400,000.00 | Merchant's Average Monthly Revenue: | $2,994,473.94 |
| Early Termination Amount***: | $540,000.00 | Specified Percentage of Monthly Revenue: | 15% |
| Early Termination Payment Date***: | December 17, 2021 | Specified Remittance Amount & Frequency: | $3,857.14 / Daily |
| Total Fees*: | $20,000.00 | Initial Estimated # of Remittance Payments: | 141 |
| Net Funded Amount**: | $380,000.00 | | |

### ORIGINAL OFFER:

| | | | |
|---|---|---|---|
| Total Purchase Price: | $400,000.00 | Merchant's Average Monthly Revenue: | $2,994,473.94 |
| Purchased Amount of Receivables: | $600,000.00 | Specified Percentage of Monthly Revenue: | 15% |
| Total Fees*: | $20,000.00 | Specified Remittance Amount & Frequency: | $3,857.14 / Daily |
| Net Funded Amount**: | $380,000.00 | Initial Estimated # of Remittance Payments: | 156 |

\* This amount reflects the total fees Merchant will pay at funding. See Appendix A for a complete breakdown of fees.

\*\* This amount reflects the total funds Merchant will receive after all the fees and balance transfers are deducted from the Total Purchase Price. See Balance Transfer Form for a complete breakdown of the remaining RTR balances.

\*\*\* If an Early Payment Addendum has been executed by GFE and the Merchant, the promotional early termination discount referenced above shall be applicable subject to the terms and conditions set forth in the Early Payment Addendum.

The Total Purchase Price may also be paid incrementally over time, in the increments and in the Specific Remittance Amounts set forth in the Attachment A Addendum annexed hereto.

THE MERCHANT AGREEMENT TERMS AND CONDITIONS SET FORTH ON PAGE 2, THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT. BY SIGNING BELOW, MERCHANT HEREBY REPRESENTS AND WARRANTS THAT NOTHING CONTAINED HEREIN IS FALSE, MISLEADING, AND THAT MERCHANT HAS NOT FAILED TO DISCLOSE ANY MATERIAL INFORMATION TO OBTAIN FUNDING FROM GFE.

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | PANAGIOTIS KECHAGIAS | Home Address: | 7000 WEST PALMETTO PARK ROAD, SUITE 302, Boca Raton, FL, 33433 |
| Title | Sole Member | Cell Phone Number: | 561-414-1632 |
| Social Security No: | ■■■■■ | Home or Secondary Number: | |
| Driver License No: | ■■■■■ | Email: | pete@hellenicpetroleumllc.com / pete@hellenicpetroleum.com |

| OWNER / GUARANTOR (#1) | | Signature | |
|---|---|---|---|
| Full Name: | PANAGIOTIS KECHAGIAS | Home Address: | 7000 WEST PALMETTO PARK ROAD, SUITE 302, Boca Raton, FL, 33433 |
| Title | Sole Member | Cell Phone Number: | 561-414-1632 |
| Social Security No: | ■■■■■ | Home or Secondary Number: | |
| Driver License No: | ■■■■■ | Email: | pete@hellenicpetroleumllc.com / pete@hellenicpetroleum.com |

GFE NY, LLC

By:

_____
(Company Officer)

# MERCHANT AGREEMENT TERMS AND CONDITIONS

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall provide GFE and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by GFE or not. This additional authorization is not a waiver of GFE's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which GFE did not first pre-approve inwriting prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of GFE.

Merchant and Guarantor(s) authorize GFE and its agents: i) to investigate Merchant's financial status and history, and will provide to GFE any authorizations, bank or financial statements, tax returns, etc., as GFE deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement and ii) to update such information and financial and credit profiles from time to time as GFE deems appropriate. Merchant hereby authorizes all of its banks, brokers, processors and customers to provide GFE with Merchant's bank statements, brokerage statements, processing history and such other statements and information as GFE may in its sole discretion require to determine Merchant's and Guarantor's qualification or continuation in this program and for collections purposes. Merchant shall provide GFE with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from GFE.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire "Purchased Amount" is received by GFE as per the terms of this Agreement. The termination of this Agreement shall not affect Merchant's continuing obligation and responsibility to fully satisfy all outstanding obligations that are due to GFE.

**1.3 Future Purchases.** GFE reserves the right to rescind the offer to make any purchase payments hereunder, in its sole and absolute discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined) authorize GFE, its agents and representatives, as well as any credit reporting agency engaged by GFE, i) to investigate their financial responsibility and history, including any references given or any other statements or data obtained from or about Merchant or any of the Guarantor(s); ii) to obtain consumer and business credit reports on the Merchant and Guarantor(s); iii) to contact any current or prior bank of the Merchant in order to obtain whatever information it may require regarding any and all of Merchant's transactions with any such bank, including, but not limited to applications, bank statements, financial statements and tax returns; and (iv) to contact personal and business references provided by the Merchant or Guarantor(s), at any time now or for so long as Merchant and/or Guarantor(s) continue to have any obligation owed to GFE as a consequence of this Merchant Agreement or for GFE's ability to determine Merchant's eligibility to enter into any future agreement with GFE. Merchant and Guarantor(s) will further provide to GFE any authorizations, bank or financial statements, tax returns, etc., as GFE deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. GFE is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Merchant and Guarantor(s) acknowledge and agree that all information (financial and other) provided by or on behalf of Merchant and Guarantor(s) has been relied upon by GFE in connection with its decision to purchase the Specified Amount of Future Receivables from Merchant.

**1.5 Transactional History.** Merchant authorizes all of their banks and brokers to provide GFE with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program. Merchant hereby (i) authorizes GFE to contact any past, present or future processor of Merchant, its predecessors or affiliates, to obtain any information that GFE deems necessary or appropriate regarding any of their transactions with such processors, and (ii) authorizes and directs such processors to provide GFE with all such information in compliance with this Section. Such information may include information to verify the amount of Card receivables previously processed on behalf of Merchant, its predecessors or affiliates, and any amounts that may have been paid to, offset, held or reversed by, such processors. Without limiting the generality of the foregoing, Merchant authorizes GFE to contact any past, present or future processor of Merchant, its predecessors or affiliates, to confirm that Merchant is exclusively using the Processoraccepted by GFE in accordance with this Agreement.

**1.6 No Liability.** In no event will GFE be liable for any claims asserted by Merchant or Guarantors under any legal theory or law,including any tort or contract theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of GFE's legal fees and expenses resulting therefrom.

**1.7 Sale of Receipts.** Merchant and GFE agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from GFE to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. GFE has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to GFE in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers.  In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, - it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that GFE has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and GFE shall promptly refund to Merchant any interest received by GFE in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that GFE not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. Merchant is not a debtor to GFE as of the date of this Agreement. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.8  Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes GFE, its agents and employees to obtain and disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that GFE obtains) and business conduct only to it employees. agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against GFE or any of its affiliates relating to any (i) investigation undertaken by or on behalf of GFE as permitted by this

**1.9**   (Stricken).

**1.10 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes GFE to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.11 D/B/A's.** Merchant hereby acknowledges and agrees that GFE may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between GFE and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.12 Sharing of Information.** Merchant hereby authorizes GFE to share information regarding Merchant's performance under this Agreement with affiliates and unaffiliated third parties.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement, and until GFE is fully paid:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial Statements, copies of which have been furnished to GFE, and future statements which will be furnished hereafter at the discretion of GFE, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise GFE of any material adverse change in their financial condition, operation or ownership. Merchant hereby warrants that its Average Monthly Revenue as enumerated on page (1) of this Agreement is accurate, and that any and all cash advances or loans outstanding by Merchant have be disclosed to GFE. GFE may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to GFE within 5 business days. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Electronic Check Processing Agreement.** Merchant is a chapter 11 debtor in possession in a case pending in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").  The parties acknowledge and agree that Merchant may open and maintain debtor in possession bank accounts without GFE's prior written consent, and that such actions by Merchant shall not constitute breaches of this Agreement.

**2.5 Change of Name or Location and Related Entities.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to GFE, nor shall Merchant change any of its places of business without prior written consent by GFE. Merchant does not and shall not conduct Merchant's business under any name other than as set forth in this agreement and shall not change its place of business. Merchant shall not change its legal name, entity type or jurisdiction of organization. In the event Merchant, any of its officers or directors or any Owner/Guarantor, during

the term of this agreement or while Merchant remains liable to GFE for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GFE under this Agreement. With respect to any such entity, GFE shall have the right to name such newly formed or existing entity as a debtor in any claim, suit, or legal proceeding.

**2.6  Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.7  Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.8  Good Faith, Best Efforts and Due Diligence.** Merchant and Guarantors hereby affirm that it will conduct its business in Good Faith and will expend its Best Efforts to maintain and grow its business, to ensure that GFE obtains the Purchased Amount. Furthermore, Merchant and Guarantors hereby agree, warrant and represent hereby that they will constantly perform all appropriate Due Diligence and credit checks of all of the customers' finances, cash flow, solvency, good faith, payment histories and business reputations (the "Due Diligence Requirements") as may suffice to ensure any and all products and/or services provided, sold or delivered by Merchant to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account. These Due Diligence Requirements must be performed prior to any sales to any customer, and repeated no less frequently than monthly for so long as any sums are due from those customers. Full documentation of all of Merchant's compliance with its Due Diligence Requirements must be maintained in Merchant's files.  This is not a guaranty of payment by customers, but is a guaranty of full, adequate and good faith Due Diligent investigation and credit check of customers before extending credit to them and continuing no less frequently than monthly so long as sums are still due.

**2.9  Taxes.** Merchant will promptly pay all necessary taxes, including but not limited to employment, sales and use taxes.

**2.10  Opportunity for Counsel.** Merchant represents, warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Merchant Agreement, and that it has been represented by legal counsel or has had full opportunity to consult with its own legal counsel.

**2.11  Ongoing Obligations.** Merchant hereby covenants and agrees that even after it receives some or all of the Purchase Price from GFE, it will comply with GFE's ongoing requests for any documentation from Merchant for the purpose of business and identify verification and underwriting and verification (such as the merchant's driver's license, bank login, bank statements, or any other financial or business documentation). Merchant's failure to provide to GFE the requested documentation within three (3) business days shall be deemed a breach of this Agreement and GFE shall no longer be obligated to provide any further funding to Merchant. In addition, if after receipt of said documentation from Merchant, GFE discovers that Merchant made misrepresentations before receiving funding from GFE, GFE shall no longer be obligated to provide any further funding to Merchant and Merchant's misrepresentations shall be deemed a breach of this Agreement.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1  Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) the sending of notice of termination by Merchant; (d) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (e) Merchant shall transfer or sell all or substantially all of its assets, or issue any notice of intended bulk sale or transfer; (f) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (g) Merchant shall use multiple depository accounts without the prior written consent of GFE (h) Merchant shall change its depositing account without the prior written consent of GFE; (i)

Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (j) Merchant fails to remit the Specified Remittance Amount in the manner and frequency set forth herein; or (k) Merchant fails to deposit its Receipts into the Account.

**3.2 Personal Guaranty.** In the event of a Default under Sections 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, and 2.14 hereof, should GFE determine that the Purchased Amount cannot be obtained from the Merchant's business, GFE will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to GFE for all of GFE's losses and damages, in addition to all costs, fees expenses and legal fees associated with such enforcement. GFE shall not be required before exercising and enforcing its rights under this Personal Guaranty first to resort to payment against Merchant or to any other person or to any collateral.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, GFE may file a motion for relief from the automatic stay codified at 11 U.S.C. § 362 in the Bankruptcy Court on an emergency basis, and in such motion may request stay relief to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the performance of Merchant's and each Owner's/Guarantor's obligations hereunder, under the Security Agreement or Guaranty, or pursuant to any other legal or equitable right or remedy. Upon Merchant's and/or Owner's/Guarantor's default hereunder, the balance of the Purchased Amount remaining due, plus any applicable fees, shall become immediately due and payable to GFE.

**3.4 Costs.** Merchant shall pay to GFE all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(b) the enforcement of GFE 's remedies set forth in Section 3.3 above, including but not limited to court costs and attorneys' fees.

**3.5 Required Notifications.** Merchant is required to give GFE seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

# IV.MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by GFE.

**4.2 Assignment.** This Agreement shall be binding upon and inure to the benefit of Merchant, Principal(s), GFE and their respective successors and assigns, except that Merchant and Principal(s) shall not have the right to assign or delegate any of their rights or obligations hereunder or any interest herein without prior written consent of GFE, which consent may be withheld in GFE's sole discretion. Any such assignment or delegation without GFE's prior written consent shall be void. GFE reserves the right to assign or delegate this Agreement or any of its rights or obligations hereunder with or without prior notice to Merchant. GFE may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the merchant at the address set forth above in this agreement and to GFE at 2999 NE 191st Street, Unit 901, Miami, FL 33180 with a copy to 27-01 Queens Plaza North, Suite 802, Long Island City, NY 11101. Notices to GFE shall become effective only upon receipt by GFE. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of GFE to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, GFE and their respective successors and assigns. GFE reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall be instituted in the Bankruptcy Court. Merchant agrees that the Bankruptcy Court is convenient to it, and submits to the jurisdiction of the Bankruptcy Court and waives any and all objections to jurisdiction or venue. Should such proceeding be initiatedin any other forum, Merchant waives any right to oppose any motion or application made by GFE to transfer such proceeding to the Bankruptcy Court.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provision in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and GFE and supersede all prior agreements and understandings relating to the subject matter hereof. Merchant and Principal(s) each acknowledge and agree that

he, she or it is not relying on any representations not specifically embodied in this Agreement.

**4.10 JURY TRIAL WAIVER.**

THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.11 Facsimile Acceptance.** Merchant and Guarantor(s) hereby agree that facsimile and/or electronic signatures on this Merchant Agreement and Guaranty, or photocopies thereof, that shall be deemed acceptable and treated as originals for all purposes, and shall be admissible as evidence of the Merchant Agreement and Guaranty.

**4.12. Right of Access.** In order to ensure that Merchant is complying with the terms of this Merchant Agreement, Merchant agrees that GFE shall have the right to (i) enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Merchant's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's daily receipts to the Processor and to ensure that Merchant has not violated any other provision of this Agreement, and (ii) Merchant's shall provide access to its employees and records and all other items as requested by GFE, and (iii) have Merchant's provide information about its business operations, banking relationships, vendors, landlord and other information to allow GFE to interview any relevant parties. Furthermore, Merchant agrees to provide GFE, at all times with "Live Contemporaneous Access" to all of its bank accounts in order for GFE to evaluate Merchant's compliance with the Merchant Agreement, and for collections in the event of a default under the Merchant Agreement. "Live Contemporaneous Access" shall be defined as: Merchant, at all times and including but not limited to, providing GFE with accurate login information necessary to access all of Merchant's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens.

**4.13. Phone Recordings and Contact.** Merchant agrees that any call between GFE and Merchant, and their agents and employees may be recorded or monitored. Further, Merchant agrees that (i) it has an established business relationship with GFE, its employees and agents and that Merchant may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to GFE by the Merchant, its agents or employees, including cellular telephones.

**4.14. Monitoring, Recording, and Solicitations.**

a. Authorization to Contact Seller by Phone. Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

b. Authorization to Contact Seller by Other Means. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

**GFE NY, LLC. - SECURITY AGREEMENT AND GUARANTY**

| | |
|---|---|
| Merchant's Legal Name: | HELLENIC PETROLEUM, LLC. |
| D/B/A: | HELLENIC PETROLEUM, LLC. |
| Federal EIN: | 81-4208066 |
| Physical Address: | 7000 WEST PALMETTO PARK ROAD, SUITE 302, Boca Raton, FL, 33433 |

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant grants to GFE a security interest in and lien upon: (a) all accounts receivables, accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant, (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to GFE under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to GFE upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover GFE's entitlements under this Agreement, GFE is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of GFE's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, GFE or an affiliate of GFE. GFE is authorized to execute and file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

This security interest may be exercised by GFE without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, GFE has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, GFE will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from GFE written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant agrees that this is a contract of recoupment and GFE is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant agrees not to contest or object to any motion for relief from the automatic stay filed by GFE. Merchant agrees to execute and deliver to GFE such instruments and documents GFE may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. GFE is authorized to execute all such instruments and documents in Merchant's name.

In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to GFE for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity, otherwise becomes associated with any new or existing entity, or was and/or is associated with an existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due GFE under this Agreement. With respect to any such entity, GFE shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. GFE shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. GFE shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of GFE's rights, including without limitation, GFE's right to collect all accounts, and to notify any payment card processor or creditor of such entity that GFE has such rights in such entity's assets. Merchant also agrees that, at the GFE's discretion, GFE may choose to amend any existing financing statement to include any such newly formed entity as debtor.

Merchant and Guarantor each acknowledge and agree that any security interest granted to GFE under any other agreement between Merchant or Guarantor and GFE (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement.

Merchant and Guarantor each agrees to execute any documents or take any action in connection with this Agreement as GFE deems necessary to perfect or maintain GFE's first priority security interest in the Collateral including the execution of any account control agreements. Merchant and Guarantor each hereby authorizes GFE to file any financing statements deemed necessary by GFE to perfect or maintain GFE's security interest, which financing statement may contain notification that Merchant and/or Guarantor have granted a negative pledge to GFE with respect to the Collateral, and that any subsequent lien or may be tortuously interfering with GFE's rights. Merchant and Guarantor shall be liable for, and GFE may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by GFE in protecting, preserving and enforcing GFE's security interest and rights.

**Negative Pledge.** Merchant and Guarantor each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease.** GFE shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, GFE may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that GFE may enter into an agreement with Merchant's landlord giving GFE the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, GFE may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to GFE, whether by acceleration or otherwise.

Agent Name: ISO - Crown Funding Source

## GUARANTY

**Personal Guaranty of Performance.** The undersigned Guarantor(s) hereby guarantees to GFE, Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in the Merchant Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13 and 2.14, as each agreement may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, GFE may seek recovery from Guarantors for all of GFE's losses and damages by enforcement of GFE's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral GFE may hold pursuant to this Agreement or any other guaranty.

GFE does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount owed under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) GFE's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to GFE. In addition, GFE may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to GFE; (ii) release Merchant from its obligations to GFE; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Merchant Amount plus any accrued but unpaid interest and Merchant's other obligations to GFE under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iii) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

**Joint and Several Liability.** The obligations hereunder of the persons or entities constituting Guarantor under this Agreement are joint and several.

**THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.**

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | PANAGIOTIS KECHAGIAS | **Social Security No:** | ███████ |
| **Title** | Sole Member | **Driver License No:** | ████████████ |
| **Signature** | | | |

| OWNER / GUARANTOR (#1) | | | |
|---|---|---|---|
| **Full Name:** | PANAGIOTIS KECHAGIAS | **Social Security No:** | ███████ |
| **Title** | Sole Member | **Driver License No:** | ████████████ |
| **Signature** | | | |

Agent Name: ISO - Crown Funding Source

**APPENDIX A STRUCTURE:**

A. **Origination Fee** - 3% of Purchase Price to cover Underwriting and related expenses. This expense is charged at the time of funding.

B. **ACH Program Fee** - 2% of Purchase Price ACH's are labor intensive and are not an automated process, requiring us to charge this fee to cover costs. This expense is charged at the time of funding.

C. **Miscellaneous Service Fees** - Merchant shall pay certain fees for services related to the origination and maintenance of Accounts, which fees are set forth below. Each Merchant shall receive their funding electronically to their designated bank account, and the GFE may deduct some or all of the fees from the funded amount.

A. Rejected ACH/Blocked ACH - $5,000.00 when Merchant blocks Account from our Debit ACH, or when Merchant directs the bank to reject our debit ACH, which places them in default (per contract).

B. Pre-Authorized Bank Change Fee - $50.00 When Merchant requires a change of Bank Account to be debited, requiring us to adjust our system.

C. Wire Fee - $50.00 Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for either a Fed Wire fee or a bank ACH fee.

D. UCC Filing, Amendment or Termination Fee - $200.00.

E. Default Fee - $5,000.00 when Merchant defaults under the Agreement, including but not limited to diverting its Receivables from the bank account agreed upon in the "Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits)" or changing its credit card processing thus terminating or diverting the agreed upon split.

F. Account Management Fees - $45.00 upon origination, and $45.00 per month thereafter until the Purchase Amount, together with any and all unpaid outstanding other fees have been paid in full. These Management Fees will not be applied towards the reduction of the Purchase Amount.

G. Third Party Collections Fee – In the event that Merchant defaults under any of the terms and conditions of this Agreement, Merchant shall pay to GFE, in addition to any other fees associated with Merchant's default, a third party collections fee equal to fifteen (15%) of the outstanding balance after all fees at the time of default.

H.    NSF Fee (Standard) - $ 35.00 each until a default is declared.

I. Non-ACH Transaction Fee - When a Merchant makes a payment other than through ACH, the Merchant is responsible for the cost of that transaction.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | PANAGIOTIS KECHAGIAS | **Social Security No:** | ███████ |
| **Title** | Sole Member | **Driver License No:** | ██████████ |
| **Signature** | | | |

Agent Name: ISO - Crown Funding Source

## Merchant Verification Form

| Merchant Name: PANAGIOTIS KECHAGIAS | |
|---|---|
| 1. Do you currently or within the last 90 days have any intentions, plans or discussions regarding closing your Business? | |
| 2. Do you currently or within the least 90 days have any intentions, plans or discussions to change the name or legal structure of the business? | |
| 3. Are you currently in, or contemplating personal bankruptcy? | |
| 4. Are you currently in, or contemplating business bankruptcy? | |
| 5. Is your business currently for sale? | |
| 6. Do you have any existing merchant cash advance balances? | |
| 7. Are you involved in any litigation proceedings or are a party to a lawsuit? | |
| 8. Is your business currently in default of any agreement with a creditor? | |
| 9. Is your business currently in forbearance agreement with a creditor? | |
| 10. Will selling the Future Receivables cause you to breach any agreement with a creditor? | |

| If you have answered YES to any of the above questions, please explain: |
|---|
| |
| |
| |
| |

I hereby certify that the above statements are true and correct to the best of my knowledge; I authorize my landlord and credit card processor to discuss confidential account information for the purpose of satisfying the requirements of GFE NY, LLC.

Completed and attested by:

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | PANAGIOTIS KECHAGIAS | **Social Security No:** | ███████ |
| **Title** | Sole Member | **Driver License No:** | ███████████ |
| **Signature** | | | |

Thank you for accepting an offer from GFE NY, LLC ("GFE"). We look forward to being your funding partner for as long as you need.

Please note that the way your advance is set up with GFE, GFE requires viewing access to your bank account each business day, throughout the term of this Agreement, in order that GFE may calculate and verify the amount of your daily remittance. Please be assured that we will carefully safeguard your confidential information and only essential personnel will have access to it.

GFE NY, LLC. will also require viewing access to your bank account, prior to funding, as part of the underwriting process.

Please be advised that for security purposes, GFE will request this information prior to funding. By signing below, you hereby agree that if you fail to provide the requested bank login information prior to funding, GFE shall have no obligation to provide funding. Please be further advised that if you change any of the bank login information during the term of this Agreement or at any time while you still have any outstanding obligations to GFE, you are required to immediately inform GFE of the changes made and provide GFE with the new bank login information. Please see below for the list of questions that will be by GFE as it relates to the banking information.

1. Bank Portal Website;
2. Bank Account Username;
3. Bank Account Password;
4. Security Question/Answer 1 of this Bank Account;
5. Security Question/Answer 2 of this Bank Account;
6. Security Question/Answer 3 of this Bank Account; and
7. Any other information necessary to access your Bank Account.

If you have any questions please feel free to contact our cash management department.

| MERCHANT (#1) | | | |
|---|---|---|---|
| **Full Name:** | PANAGIOTIS KECHAGIAS | **Social Security No:** | ████████ |
| **Title** | Sole Member | **Driver License No:** | ████████████ |
| **Signature** | | | |

Agent Name: ISO - Crown Funding Source

## ADDENDUM TO MERCHANT AGREEMENT

This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any litigation relating to this Agreement must be commenced and maintained in any court located in New York State (the "Acceptable Forums"), however any action or proceeding to enforce a judgment or arbitration award may also be commenced and maintained in any other court of competent jurisdiction. The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum.

**THE PARTIES AGREE TO WAIVE TRIAL BY JURY IN ANY DISPUTE BETWEEN THEM.**

In any litigation commenced by GFE, Merchant and Guarantor will not be permitted to interpose any counterclaim. Merchant and Guarantor agree that any claim that is not asserted against GFE within 1 year of its accrual will be time barred. If GFE prevails in any litigation with Merchant and/or Guarantor, then Merchant and Guarantor must pay GFE's reasonable attorney fees, which may include a contingency fee of up to 33% of the amount claimed, expert fees, costs of suit, and prejudgment interest at a rate of 16% per annum (or the maximum rate permitted by applicable law if lower). GFE, Merchant, and Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**Merchant and Guarantor consent to service of process and legal notices made by certified mail, return receipt requested delivered by the United States Postal Service and addressed to the Contact Address set forth immediately below or on Page 1 of this Agreement, any such service will be deemed complete 5 days after dispatch.**

I have read and agreed to the Terms and Conditions set forth above:

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | PANAGIOTIS KECHAGIAS | Home Address: | 7000 WEST PALMETTO PARK ROAD, SUITE 302, Boca Raton, FL, 33433 |
| Title | Sole Member | Cell Phone Number: | 561-414-1632 |
| Social Security No: | ██████ | Home or Secondary Number: | |
| Driver License No: | ████████ | Email: | pete@hellenicpetroleumllc.com / pete@hellenicpetroleum.com |

June 1, 2021

## EARLY PAYMENT ADDENDUM

This is an addendum to the Merchant Agreement (the "Agreement") dated June 1, 2021 by and between **GFE NY, LLC.** (Purchaser), and **HELLENIC PETROLEUM, LLC.** (Merchant's Legal Name) and **PANAGIOTIS KECHAGIAS** (Owner/Guarantor). Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

Pursuant to that certain AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (the "ACH Authorization"), executed by the Merchant and annexed to the Agreement, Merchant has authorized Purchaser to Electronically (ACH) debit the Bank Account set forth on the ACH Authorization according to the payment schedule set forth on the ACH Authorization (the "Payment Schedule").

In the event that Merchant satisfies each of the following conditions ("Early Payment Discount Conditions"), Purchaser agrees to accept the Early Termination Amount (as hereinafter defined) instead of the Purchased Amount in satisfaction of all of Merchant's obligations under the Agreement.

Early Payment Discount Conditions:

i)      Merchant shall remit Receipts to Purchaser totaling $540,000.00 (the "Early Termination Amount"), on or before December 17, 2021 (the "Early Payment Date");

ii)     Merchant shall not be in default under the Agreement;

iii)    Merchant shall make payments according to the Payment Schedule without having missed more than two payments.

TIME IS OF THE ESSENCE FOR EACH AND EVERY PROVISION OF THIS ADDENDUM. AFTER THE EARLY PAYMENT DATE HAS PASSED, PURCHASER WILL NO LONGER ACCEPT THE EARLY TERMINATION AMOUNT AS SATISFACTION OF MERCHANT'S OBLIGATIONS UNDER THE AGREEMENT.

| MERCHANT (#1) | | Signature | |
|---|---|---|---|
| Full Name: | PANAGIOTIS KECHAGIAS | Home Address: | 7000 WEST PALMETTO PARK ROAD, SUITE 302, Boca Raton, FL, 33433 |
| Title | Sole Member | Cell Phone Number: | 561-414-1632 |
| Social Security No: | ███████ | Home or Secondary Number: | |
| Driver License No: | ███████████ | Email: | pete@hellenicpetroleumllc.com / pete@hellenicpetroleum.com |

GFE NY, LLC

By:

_____
(Company Officer)

**GFE**

**GLOBAL FUNDING EXPERTS**

2701 QUEENS PLAZA NORTH, SUITE 802, LONG ISLAND CITY, NY 11101
Tel: 1-877-253-7686, Fax: 718-504-3736
Website: www.globalfundingexperts.com / Email: underwriting@globalfundingexperts.com

## EXHIBIT A – ADDITIONAL ENTITIES SUBJECT TO THE TERMS OF THIS CONTRACT

1. HELLENIC PETROLEUM, LLC.
PHSYICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433
TAX ID: 81-4208066

2. HELLENIC SEAS HOLDINGS INC
PHSYICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433
TAX ID: 81-4208066

3. CONSOLIDATED RESOURCES, INC
PHSYICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433
TAX ID: 81-4208066

4. MYKONOS GREEK BISTRO, LLC.
PHSYICAL ADDRESS: 7000 WEST PALMETTO PARK ROAD, SUITE 302, BOCA RATON, FLORIDA, 33433
TAX ID: 81-4208066

5. HELLENIC MANAGEMENT LLC
PHSYICAL ADDRESS: 9858 GLADES ROAD, SUITE 219, BOCA RATON, FLORIDA, 33433
TAX ID: 81-4208066

6. CAPITAL TRADE FINANCE LLC
PHSYICAL ADDRESS: 9858 GLADES ROAD, SUITE 219, BOCA RATON, FLORIDA, 33433
TAX ID: 81-4208066

7. HELLENIC SHIPPING MANAGEMENT LLC
PHSYICAL ADDRESS: 9858 GLADES ROAD, SUITE 219, BOCA RATON, FLORIDA, 33433
TAX ID: 81-4208066

# EXHIBIT D

**Hellenic Petroleum LLC**
**Projected Expenses**
June 2021

| Account | Week 1 | Week 2 | Week 3 | Week 4 | Total |
|---|---|---|---|---|---|
| Income | | | | | |
| Fuel Sale | $ 1,999,912.50 | $ 1,999,912.50 | $ 1,999,912.50 | $ 1,999,912.50 | $ 7,999,650.00 |
| Total Income | $ 1,999,912.50 | $ 1,999,912.50 | $ 1,999,912.50 | $ 1,999,912.50 | $ 7,999,650.00 |
| Cost of Goods Sold | $ - | $ - | $ - | $ - | |
| Fuel Purchase | $ 1,871,417.00 | $ 1,871,417.00 | $ 1,871,417.00 | $ 1,871,417.00 | $ 7,485,668.00 |
| Total Cost of Goods Sold | $ 1,871,417.00 | $ 1,871,417.00 | $ 1,871,417.00 | $ 1,871,417.00 | $ 7,485,668.00 |
| Gross Profit | $ 128,495.50 | $ 128,495.50 | $ 128,495.50 | $ 128,495.50 | $ 513,982.00 |
| | | | | | |
| Expenses | | | | | |
| Bank Charges & Fees | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 2,000.00 |
| Business Licenses and Taxes | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 300.00 |
| Dues & Subscriptions | $ 500.00 | $ 500.00 | $ 500.00 | $ 500.00 | $ 2,000.00 |
| Equipment Expenses | $ 600.00 | $ 600.00 | $ 600.00 | $ 600.00 | $ 2,400.00 |
| Fleet Expense | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 5,500.00 | $ 22,000.00 |
| Insurance | | | | | |
| Health Insurance | $ 1,648.75 | $ 1,648.75 | $ 1,648.75 | $ 1,648.75 | $ 6,595.00 |
| Liability Insurance | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 12,000.00 |
| Merchant Fees | $ 52,000.00 | $ 52,000.00 | $ 52,000.00 | $ 52,000.00 | $ 208,000.00 |
| Adequate Protection Payments | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 40,000.00 |
| Office Expense | $ 375.00 | $ 375.00 | $ 375.00 | $ 375.00 | $ 1,500.00 |
| Payroll Expenses | $ 9,500.00 | $ 9,500.00 | $ 9,500.00 | $ 9,500.00 | $ 38,000.00 |
| Professional Services | . | | | | |
| Consulting | $ 1,250.00 | $ 1,250.00 | $ 1,250.00 | $ 1,250.00 | $ 5,000.00 |
| Total Professional Services | $ 1,250.00 | $ 1,250.00 | $ 1,250.00 | $ 1,250.00 | $ 5,000.00 |
| Rent & Lease | $ 6,122.00 | $ 6,122.00 | $ 6,122.00 | $ 6,122.00 | $ 24,488.00 |
| Repairs & Maintenance | $ 625.00 | $ 625.00 | $ 625.00 | $ 625.00 | $ 2,500.00 |
| Utilities | $ 425.00 | $ 425.00 | $ 425.00 | $ 425.00 | $ 1,700.00 |
| Retainers | $ 25,000.00 | $ 25,000.00 | $ - | $ - | $ 50,000.00 |
| Total Expenses | $ 118,370.75 | $ 118,370.75 | $ 93,370.75 | $ 93,370.75 | $ 423,483.00 |
| Net Operating Income | $ 10,124.75 | $ 10,124.75 | $ 35,124.75 | $ 35,124.75 | $ 90,499.00 |